UNITED STATES of America

v.

Claude K. WEST.

Crim. No. 80–51–G.

United States District Court,
D. Massachusetts.

Sept. 5, 1980.

John H. LaChance, Asst. U. S. Atty., Boston, Mass., for plaintiff.

Thomas Edwards, Chaplin, Casner & Edwards, Boston, Mass., for defendant.

## MEMORANDUM AND ORDER DENYING MOTION TO SUPPRESS

GARRITY, District Judge.

This case came on for pretrial hearing on the defendant's objections to the Magistrate's recommendation, dated July 21, 1980, that defendant's motion to suppress be denied. At the hearing before the Magistrate, only the Government presented its evidence on the motion to suppress. For reasons unclear to us, defendant was permitted to reserve his right to present rebutting evidence until after the Magistrate issued her findings and recommendations on the basis of the Government's evidence. On August 22, 1980, at the hearing both on defendant's objections to the Magistrate's report and on the motion to suppress, we first received defendant's evidence and then heard arguments from both parties on the pending motion. Our ruling on the defendant's motion is based on a combination of the record developed before the Magistrate and the testimony presented to us on August 22. See *United States v. Raddatz*, (1980) —— U.S. ——, 100 S.Ct. 2406, 65 L.Ed.2d 424.

At the close of arguments at the August 22 hearing we dictated in open court our findings of fact and conclusions of law with respect to the search of the defendant in Miami. Some of those findings are repeated in this memorandum. We then invited counsel to file briefs, predicated upon our oral findings, with respect to the events that unfolded after the defendant landed in Boston from Miami. For reasons and on findings of fact stated herein and in open court, we deny defendant's motion to suppress.

### Miami Encounter

The defendant West was first observed by two officers of the Public Safety Department in Miami while he waited in line to purchase a ticket. It was mid–morning, the defendant wore a wrinkled suit, carried a medium–sized bag, and appeared to the officers to be looking around nervously. Based on West's behavior and appearance, and on his conversation with an airline clerk overheard by one of the officers, the two Miami officers approached West after he passed through the security x–ray machine. They identified themselves and asked West for his driver's license and airline ticket, which they examined and returned. In the course of the ensuing confrontation, the details of which are only partly disputed by the parties, the officers told West they thought he might be carrying drugs, in particular cocaine; West's boots were searched with his consent, turning up nothing; he refused the officers' request to search his bag; and he then continued on his way, boarding a flight for Boston.

While the defendant was enroute to Boston, the Miami officers checked with the airline and learned that West had paid for his ticket in cash (which could include personal check) and that he left no call back phone number. They also ran West's name through a computer index of persons arrested for drugs or suspected in drug investigations. The index showed no record of the

defendant. The agents then called Drug Enforcement Administration (DEA) agents in Boston, to whom they recounted details of their encounter with West, including the fact that he had refused to consent to a search of the bag.

### Boston Encounter

Immediately upon deplaning at Logan Airport the defendant looked around the arrival area and there spotted the Boston based DEA agent Robert Sampson. The defendant went directly to the departure gate of his connecting flight to Vermont (followed by Sampson), checked in, and then went to the men's room. As he left the men's room, West was observed by the agents to pause at the door, look up and down the concourse, and after a minute, move on. When he returned to the departure gate, Sampson and another agent approached him and asked for identification, which he produced. West explained he was coming from Miami where he had visited a friend. When the agents suggested he might have drugs in his bag, West volunteered that two agents had already stopped to question him in Miami. They pressed him further about the Miami search and West twice stated that the Miami officers had searched his bag, finally admitting on the third inquiry that they had not.

The agents next asked West if they could look in his bag, adding that he had the right to refuse their request. When the defendant refused to consent to a search of his bag, the agents told him that they would keep his bag long enough to have a specially trained narcotics detecting dog brought over from Customs. He was given the choice of staying in Boston with the bag or leaving on his Vermont flight without it. He chose to leave without the bag, and the agents brought it back to their office to await the narcotics dog. When the dog arrived (about one hour after West was first stopped by the agents at Logan) it sniffed the bag and "alerted," indicating the presence of narcotics. The agents then applied for and were issued a search warrant on the strength of an affidavit that recounted details of the Miami and Boston encounters and the alert by the narcotics dog. The search of the bag turned up twenty ounces of cocaine, which is the subject of this suppression motion. West was met by other agents when he arrived in Vermont and they arrested him after learning the results of the Boston search.

### Conclusions of Law–Miami

■ Considering all the attendant circumstances of the Miami encounter, we concluded that West was not "seized" in Miami within the meaning of the Fourth Amendment. Accordingly, we held that the Miami agents did not have to supply an articulable and reasonable suspicion of wrongdoing to justify stopping the defendant, and that no violation of the Fourth Amendment occurred in Miami. *See United States v. Mendenhall*, 1980, —— U.S. —— at —— ——, 100 S.Ct. 1870, at 1874–1876, 64 L.Ed.2d 497; *Terry v. Ohio*, 1968, 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889.

Our application of the *Mendenhall* case to the facts here presented was fully developed in the findings and conclusions we dictated in open court at the August 22 hearing. In deciding whether the defendant had been seized, we employed the test described in *Mendenhall*, viz., whether a reasonable person under the circumstances "would have believed that he was not free to leave." *Mendenhall, supra*, —— U.S. at ——, 100 S.Ct. at 1877. The Supreme Court gives substance to this definition by citing examples of the circumstances that establish a seizure. In our view these examples without question distinguish West's encounter with agents in Miami from a true seizure under the Fourth Amendment.

Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance might be compelled.

*Id.,* at ——, 100 S.Ct. at 1877. The Court contrasts these examples with a description of the stop of the respondent in *Mendenhall,* a detainment the Court held did not constitute a seizure.

The events took place in the public concourse. The agents wore no uniforms and displayed no weapons. They did not summon the respondent to their presence, but instead approached her and identified themselves as federal agents. They requested, but did not demand to see the respondent's identification and ticket. Such conduct, without more, did not amount to an intrusion upon any constitutionally protected interest. The respondent was not seized simply by reason of the fact that the agents approached her, asked her if she would show them her ticket and identification, and posed to her a few questions. . . . In short, nothing in the record suggests that the respondent had any objective reason to believe that she was not free to end the conversation in the concourse and proceed on her way, and for that reason we conclude that the agents' initial approach to her was not a seizure.

*Id.,* at ——, 100 S.Ct. at 1877.

The case at bar, in our opinion, is *a fortiori.* None of the indicia of a seizure cited as examples in the *Mendenhall* opinion was present. The similarities between the Miami encounter and the events described in *Mendenhall* are self–evident, and they need no further elaboration. We move on, therefore, to consider the events surrounding the encounter in Boston.

### Conclusions of Law–Boston

■ In Boston, our attention shifts from what happened to West to what happened to his bag. There is no doubt that although West was free to leave, his bag was seized within the meaning of the Fourth Amendment. *See, United States v. Chadwick,* 1976, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538; *cf. United States v. McCain,* 5 Cir. 1977, 556 F.2d 253. The Government concedes, and we agree, that up to the time West's bag was sniffed by the specially trained dog, no probable cause existed to believe that the bag contained drugs or any other contraband. The Government instead characterizes the holding of the bag in Boston as akin to an investigative stop, which was justified by a reasonable suspicion that the bag contained contraband. After the dog "alerted" on the bag, reasonable suspicion turned into probable cause to search for drugs, and on that basis, the Government contends, a search warrant was validly obtained and executed.[1]

■ We consider first whether the seizure of West's bag for up to one hour while agents waited for the narcotics dog was so limited an intrusion that it can be fairly termed an investigative stop. If the intrusion was of such a nature that it exceeded the narrow scope of the exception defined by the *Terry* line of cases, *see, Dunaway v. New York,* 1979, 442 U.S. 200, 208–09, 99 S.Ct. 2248, 2254, 60 L.Ed.2d 743, the search would be permissible only if supported by probable cause, which it was not. On the other hand, even if the detention of the bag was nothing more than an investigative stop, the Government still bears the burden of showing that when the bag was diverted in Boston, the Boston agents had a reasonable suspicion of criminal activity, justifying the seizure. *See United States v. Jeffers,* 1951, 342 U.S. 48, 51, 72 S.Ct. 93, 95, 96 L.Ed. 59, *United States v. Short,* D.C.Cir., 1978, 570 F.2d 1051, 1055.

■ We observe first that the seizure of a person's things should be viewed in a different light from the seizure of a person. A search or stop that might be impermissibly intrusive when done to a person, may still be permissible if limited to the person's possessions. The effect on one is not entirely independent of the other, however. For example, where an officer retains a suspect's driver's license and registration, the suspect cannot lawfully operate his automobile and the effect on his personal

---

1. The defendant has not pressed his *pro forma* objection to the adequacy of the Government's affidavit, after the dog sniffing, to show probable cause for issuance of the search warrant.

liberty is more like that of an arrest than an investigative stop. *United States v. Miller*, 1 Cir. 1978, 589 F.2d 1117, 1127. Similarly, where a suspect was free to leave the scene of an interrogation only if she was willing to abandon her luggage, the effect on her freedom of action was enough to trigger the protection of a *Miranda* warning. *United States v. McCain*, 5 Cir. 1977, 556 F.2d 253, 255.

West faced something of the same dilemma when told by the Boston agents that they would keep his bag for examination by the narcotics dog. If he waited until the dog arrived he would miss his plane home to Vermont; on the other hand, his bag may have contained important personal effects he could not afford to leave behind. Taken as a whole, however, the circumstances of this case do not in our opinion warrant analyzing the detention of West's bag as anything more intrusive than an investigative stop. Competing interests are at stake here. In our view, the inconvenience to West of waiting for his bag to be forwarded on the next flight to Vermont (his final destination) must yield to the practical necessities of law enforcement agents engaged in the difficult job of controlling drug traffic through airports. *See generally, United States v. Klein*, 7 Cir. 1980, 626 F.2d 22 (airport detention of suitcase); *United States v. Van Leeuwen*, 1970, 397 U.S. 249, 90 S.Ct. 1029, 25 L.Ed.2d 282 (detention of first class mail). *Cf. Dunaway v. New York, supra*, 442 U.S. at 208–09, 99 S.Ct. at 2254. Under the circumstances, the intrusion upon defendant's rights of privacy and under the Fourth Amendment was brief and reasonably circumscribed. Accordingly, there was no requirement that the agents establish probable cause before detaining the bag.

Thus the lawfulness of the detention of West's bag in Boston depends upon whether the agents' communicated suspicion that the bag contained contraband was a reasonable suspicion. *United States v. Klein, supra*, at 25. Had we applied this test to the

Miami encounter, we believe that facts as they had developed up to that point fell short of reasonable suspicion. In Boston, on the other hand, the agents possessed most of the same objective information known to the Miami agents, and they had a further opportunity to observe the defendant and put their suspicions to a test. The facts that West paid cash for his ticket, left no call back number, or looked disheveled, may be noteworthy, but they are innocent standing alone. His scanning of the airport when he arrived in Boston, while consistent with illegal behavior, is too subjective a clue to be a strong component of reasonable suspicion. Yet, while each fact may appear unremarkable in isolation, the cumulative effect of objectively innocent facts, viewed through the trained eye of an experienced drug agent, can still turn an officer's hunch into a reasonable suspicion. *See, Brown v. Texas*, 1979, 443 U.S. 47, 52, n.2, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357; *United States v. Price*, 2 Cir. 1979, 599 F.2d 494, 501; *cf. United States v. Brignoni–Ponce*, 1975, 422 U.S. 873, 884–87, 95 S.Ct. 2574, 2581–83, 45 L.Ed.2d 607.

■ In our view, two additional facts tip the balance in carrying the Government's burden to justify the seizure. The first is West's refusal to consent to a search of his bag after he had permitted a search of his boots. No doubt, West was free to withhold consent, and his refusal to permit a search of his bag is constitutionally protected. *Terry v. Ohio, supra*, 392 U.S. at 32–33, 88 S.Ct. at 1885; *Mendenhall, supra*, —— U.S. at ——, 100 S.Ct. at 1876. For that reason the fact that he refused the search furnished no basis for seizing the bag. It did, however, "alert the officer to the need for continued observation." *Terry, supra*, 392 U.S. at 34, 88 S.Ct. at 1886. We attach significance not to the fact that West withheld consent to search his bag, but rather that he suffered the inconvenience of having his boots searched while twice refusing the no more intrusive step of searching his bag.[2]

2. From the testimony of the Miami agents it appears that the boot search amounted only to a pat–down of the boots' exterior. That may be less physically intrusive than a search of the

The second of the additional facts on which we rely flows from the first. When asked in Boston whether agents had searched his bag in Miami, West lied twice before admitting that they had not. The Boston agents knew he had refused the search in Miami; the lie gave them more reason to pursue their suspicion in the bag. When West twice refused permission to search his bag, despite consenting to a search of his boots, and then lied to the agents when asked again about his bag, he focused the agents' attention on his bag and brought to a head the cumulation of otherwise innocent behavior.[3] By choosing to conclude the encounter by detaining only the bag, the officers' investigation was carefully limited to the one object of which they believed they had reasonable suspicion. Any other privacy interest of the defendant was thereby assured of continued protection.

In our opinion the objective facts available to the Boston agents bring this case just across the threshold of reasonable suspicion. However, taken as a whole, the events leading up to the final confrontation; the combined training and experience of the four agents involved; the need to take immediate, if limited action; and the manner in which the officers confirmed their suspicions and then concluded the investigative stop, lead to our conclusion that no violation of the Fourth Amendment occurred. Accordingly, defendant's motion to suppress is denied.

---

bag, but when the defendant consented to the boot search he did not know how far the agents would take it. They may well have made him take off his boots, leaving him in stocking feet in the middle of the concourse. That he would consent to a boot search, foreseeably leading to a substantial physical inconvenience and public attention, but not consent to a search of his carry–on bag, is the inconsistency that piqued the agents' suspicions.

3. Compare, for example, the inordinate attention paid by the suspect in *United States v. Price*, 2 Cir. 1979, 599 F.2d 494, to his one shoulder bag and his relative indifference to three other pieces of luggage. The holding in Price, however, turned ultimately on other grounds not here relevant.