**UNITED STATES of America, Plaintiff, Appellee,**

v.

**Tracey VIEGAS, Defendant, Appellant.**

**Nos. 80–1233, 80–1361.**

United States Court of Appeals, First Circuit.

Argued Oct. 8, 1980.

Decided Jan. 8, 1981.

Certiorari Denied May 4, 1981. See 101 S.Ct. 2046.

Sherrill P. Cline, Boston, Mass., with whom Ravech, Aronson & Shuman, P.C., Boston, Mass., was on brief, for appellant.

John H. LaChance, Asst. U. S. Atty., Boston, Mass., with whom Edward F. Harrington, U. S. Atty., and Walter B. Prince, Asst. U. S. Atty., Boston, Mass., were on brief for appellee.

Before ALDRICH, CAMPBELL and BOWNES, Circuit Judges.

ALDRICH, Senior Circuit Judge.

At 1:00 A.M. on November 7, 1979, defendant Viegas arrived at Logan Airport in Boston from Florida with no apparent cloud over him. Later that day his suitcase, which he was required to leave behind, was opened and found to contain 290 grams of cocaine, for the possession of which he now stands convicted. Our question, procedurally presented by two appeals, is whether the court erred in denying (without findings, *United States v. Payton*, 1 Cir., 1980, 615 F.2d 922) his motion to suppress.

The evidence warranted the following. At midnight two special agents of the Drug Enforcement Administration had observed one Brooks inquire at the Delta Airlines ticket counter where bags from Flight 488 from Miami would appear. Miami is a recognized cocaine source. After being directed to the carousels on the lower level he drove his car from the upper level and parked by the lower level and returned to the lounge. Later Brooks proceeded to the appropriate gate and appeared to place a phone call. While talking he kept the booth door open and "was looking up and down the concourse." Later he stood where deplaning passengers would pass, and when defendant arrived met, but did not shake hands with him. Both men then entered adjoining phone booths. Although it later developed that Brooks placed a collect call to his residence, the agents testified that neither man put any coins in the phones.[1] Both kept their doors open and were "peering out of the phone booths, looking up and down the corridor in each direction" and appeared to be talking to each other. An agent testified that this action was "consistent with activity that is displayed by drug couriers ... to identify surveillance."

Brooks' original behavior directed the agents' attention to Viegas, and the combined activity excited their suspicions sufficiently for them to follow them down to the carousel. On this trip Brooks and defendant, alternately, turned and looked behind them five or six times. While waiting for the luggage they, again, "were constantly looking around."

When Viegas obtained his bag, both started towards the parking lot. The agents joined them as they walked, one saying to defendant, essentially, "Pardon me, sir, I am a federal narcotics agent, and I'd like to talk to you a moment," and displayed a badge. The agents denied that they used the word "stop," but conceded they expected the men to stop. The men did stop. Without voicing any objection, defendant answered where he had come from; why he had gone there (to visit a girl friend); proffered his ticket stub, and when asked for identification, handed over his driver's license. All were consistent.

The agent then asked Viegas if he had drugs in his bag, and he replied in the negative. During this exchange perspiration appeared on his brow, although it was a cold night; he paled and his hand shook. An agent told Viegas that the DEA had received a call from Miami regarding someone seen there matching his description and valise. This was untrue.[2] Asked if he

---

1. It may be said for the agents that their observation was not blatantly faulted by the record evidence that Brooks did make a call, since that call was collect. They might easily overlook the single coin initially inserted to reach the operator. Viegas did not testify. There is no evidence that he made any call.

2. This may be thought to diminish, but it could not eliminate (since defendant knew he carried no valise, having checked it through from an-

would open his bag, but told that he need not, defendant refused. Asked if he would permit a detector dog sniff, he said, "Okay, get your dog." Defendant was then asked if he would go to the office, and he said, "Yes." When it developed that no dog was available, he was told he was free to leave, but that the bag would be detained. He departed, leaving his bag, for which a warrant was subsequently obtained.

We are presented with two factual questions: whether defendant was "seized," viz., was, at any point, not free to leave, which would put a different character of the voluntariness of his behavior, and whether, if he was seized, the agents had reasonable grounds for suspicion, which would put their conduct in the clear in any event. Both parties recognize that the test, in each instance, is how the objective facts would appear to a reasonable person, e. g., *United States v. Mendenhall*, 1980, 446 U.S. 554, 100 S.Ct. 1870, 1876, 64 L.Ed.2d 497 (opinion of Stewart, J.), 100 S.Ct. at 1875, n.3 (White, J., dissenting); *United States v. Wylie*, D.C.Cir., 1977, 569 F.2d 62, cert. denied, 435 U.S. 944, 98 S.Ct. 1527, 55 L.Ed.2d 542, but devote much of their briefs to subjective argument. Thus defendant claims that seizure is established if the agents' actual reason for questioning him was suspicion of criminal activity. This is incorrect. *United States v. Vargas*, 1 Cir., 1980, 633 F.2d 891 n.10. Alternatively, the government claims it is disproved if the agents' intent, though unexpressed, was at all times to allow defendant to leave whenever he wished. This, too, is incorrect. Absent any direct evidence, the question is what should defendant, objectively speaking, reasonably have believed.

■ A "seizure" of the person has occurred, and Fourth Amendment rights arise, when "the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen" such

that he is not free to walk away. *Terry v. Ohio*, 1968, 392 U.S. 1, 16, 19 n.16, 88 S.Ct. 1868, 1878, n.16, 20 L.Ed.2d 889. This determination is not always an easy one, and particularly in the context of a polite stop by an investigative officer the question may be "extremely close." *United States v. Mendenhall*, ante, 100 S.Ct. at 1880 n.1 (Powell, J., concurring); *see United States v. Wylie*, ante, 569 F.2d at 73 (Robinson, J., dissenting in part). Where there is acquiescence to an officer who has flashed his badge and requested an interview, there may be subtle questions concerning the individual's capacity to understand his rights and even his desire to avoid incurring wrath or further suspicion. "Many people at bottom will think twice before spurning an importuning policeman." *United States v. Wylie*, ante, 569 F.2d at 73 (Robinson, J., dissenting in part). On the other hand, we think the district court's view, that there is no difference between being asked to stop, and the posing of a question which the agent believes may result in a stop, is oversimplistic. A person merely asked for directions may well be expected to stop, but he would hardly regard it as a seizure.

■ We need not determine, however, whether, or when,[3] defendant's person was seized, for even assuming this to have occurred at the initial contact, we think the agents' conduct satisfied the Fourth Amendment's test of reasonableness. *See United States v. Brignoni-Ponce*, 1975, 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607. Whether a particular police action is reasonable "is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Delaware v. Prouse*, 1979, 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 and cases cited. This latter, in turn, depends upon the officer's ability "to point to specific and articulable facts which, taken together with

---

other point), the significance of his anxious demeanor during questioning.

3. The bases for suspicion, and hence for detaining defendant's suitcase, were all obtained prior to the retaining of his license during the

walk to the office, a possible watershed point in the seizure question. *Cf. Dunaway v. New York*, 1979, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824.

rational inferences from those facts, reasonably warrant that intrusion." *Terry,* ante, 392 U.S. at 21, 88 S.Ct. at 1879. In determining which inferences are rational, due credit must be given to the experience and expertise of the officers. *Mendenhall,* ante, 100 S.Ct. at 1882 (Powell, J., concurring); *Brown v. Texas,* 1969, 443 U.S. 47, 52 n.2, 99 S.Ct. 2637, 2641, n.2, 61 L.Ed.2d 357; *Brignoni-Ponce,* ante, 422 U.S. at 885, 95 S.Ct. at 2582.

The facts before the agents, viewed in their entirety,[4] adequately justified the initial inquiry. There was no extended detention, no indication that defendant was in a particular hurry, and no search of his person or (initially) of his belongings. The slight intrusion of this encounter was supported by the pair's evasive actions in the airport, viewed in the light of defendant's arrival from a known distribution center. It is no answer to say, as does defendant, that his actions were "consistent with innocent behavior." *See United States v. McCaleb,* 6 Cir., 1977, 552 F.2d 717, 720. "It must be rare indeed that an officer observes behavior consistent only with guilt and incapable of innocent interpretation." *United States v. Price,* 2 Cir., 1979, 599 F.2d 494, 502; *see Terry,* ante, 392 U.S. at 22, 23, 88 S.Ct. at 1880. We are concerned only with reasonable, articulable grounds for suspicion, and the district court was warranted in finding them present here.[5]

■ Defendant next challenges the detention of his suitcase, declaring it a "warrantless seizure [which] must be justified by an exception to the fourth amendment's warrant requirement." All agree that for the agents to open the suitcase required

probable cause and, absent an exception, a warrant. The same rule does not apply, however, to a temporary detention pending investigation. *United States v. VanLeeuwen,* 1970, 397 U.S. 249, 90 S.Ct. 1029, 25 L.Ed.2d 282; *United States v. Klein,* 7 Cir., 1980, 626 F.2d 22, 25–26. Although defendant was doubtless inconvenienced by the detention of his luggage (though less so than if he were going away rather than returning home), the impact on his reasonable expectation of privacy, *Katz v. United States,* 1967, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (Harlan, J., concurring), in no way compares with an actual search of the contents. *United States v. Chadwick,* 1977, 433 U.S. 1, 13 & n.8, 97 S.Ct. 2746, 2484, n.8, 53 L.Ed.2d 538. Rather than probable cause, such a detention is governed by the same standard as a temporary detention of the person, *i. e.,* reasonable suspicion. The various behavior information already before the agents satisfied this test.

■ Defendant's final complaint is that the warrant to search his luggage was not supported by probable cause. The affidavit in support recited the above facts, and some others. Defendant, although told he could call for his valise, had not done so.[6] More significantly, a check of the files revealed that a confidential informant had told the DEA that defendant had been dealing in cocaine; that in 1978 the informant had observed defendant with large quantities of same and had purchased some from him; and that defendant brought the cocaine in from Florida. Other information from the same source had been independently corroborated in the past.[7] We hold that the affi-

---

4. The dissent "consider[s] each factor in turn." We may agree that some were of little consequence. However, a picture may be composed of "a series of acts, each of them perhaps innocent in itself, but which when taken together warranted further investigation." *Terry v. Ohio,* ante, 392 U.S. at 22, 88 S.Ct. at 1880.

5. There was considerably greater cause for suspicion here than in *Reid v. Georgia,* —— U.S. ——, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980). In particular, defendant's and Brooks' frequent glances over their shoulders at no one in particular (Reid was looking at a man who had exited

the same plane and later joined him), and their actions in the telephone booths, would reasonably suggest attempted detection, and evasion, of surveillance.

6. How suspicious that was, however, depends on what time the affidavit was made out, which did not appear.

7. We are inclined to discount the affidavit's further recital that a police detective had reported in 1978 that defendant was planning to transport cocaine from Florida to Massachu-

davit met the two-pronged test of *Spinelli v. United States*, 1969, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637. First, the source was apparently reliable. Second, the information was based on the personal observations of the informant, as duly recited in the affidavit. Defendant argues that these observations, being a year old, were "stale," insufficient "to justify a finding of probable cause *at that time.*" *Sgro v. United States*, 1932, 287 U.S. 206, 210, 53 S.Ct. 138, 140, 77 L.Ed. 260 (emphasis added). He forgets that although "a warrant's validity depends in part on 'the proximity or remoteness of the events observed,' nevertheless the determination of timeliness as an element in probable cause must be by the circumstances of each case." *United States v. DiMuro*, 1 Cir., 1976, 540 F.2d 503, 516, *cert. denied*, 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749; *see United States v. Dauphinee*, 1 Cir., 1976, 538 F.2d 1, 5. Obviously, the year-old observation did not, by itself, establish probable cause that defendant was carrying cocaine in the airport. If its probative value was slight, however, its corroborative value was more significant. In this regard it is crucial that the agents received this information only after their contact with defendant; their initial observations and deductions were not influenced by it. The cumulative effect was to establish probable cause to search defendant's bag.

This case presents the common picture of "a proper progression of escalating responses to circumstances which generated a mounting degree of suspicion." *United States v. Wylie*, ante, 569 F.2d at 66; *see Terry*, ante, 392 U.S. at 10, 88 S.Ct. at 1874. We hold the court warranted in denying defendant's motion to suppress.

*Affirmed.*

BOWNES, Circuit Judge (dissenting).

Although the question of whether and when a seizure occurred is not without difficulty, I accept the majority's assumption that a seizure occurred at the initial contact. I do not agree, however, that at that time there were such reasonable grounds for suspicion as to justify the police invasion of defendant's fourth amendment rights.

The majority opinion sets forth correctly, for the most part, the principles and approach that apply to a case of this type. It, however, relegates to a footnote and then dismisses with a cavalier conclusory statement the case which in my opinion is clearly controlling. *Reid v. Georgia*, —— U.S. ——, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980). In both *Reid* and the instant case, it was assumed, without deciding, that the initial questioning constituted a seizure. The issues are therefore identical: whether the agents' actions were justified by articulable and reasonable grounds for suspicion.

The facts of *Reid* as set forth in the opinion are as follows:

The petitioner arrived at the Atlanta Airport on a commercial airline flight from Fort Lauderdale, Fla., in the early morning hours of August 14, 1978. The passengers left the plane in a single file and proceeded through the concourse. The petitioner was observed by an agent of the DEA, who was in the airport for the purpose of uncovering illicit commerce in narcotics. Separated from the petitioner by several persons was another man, who carried a shoulder bag like the one the petitioner carried. As they proceeded through the concourse past the baggage claim area, the petitioner occasionally looked backward in the direction of the second man. When they reached the main lobby of the terminal, the second man caught up with the petitioner and spoke briefly with him. They then left the terminal building together.

setts. Although credit must be given for the source, we assume that this was not first hand information. The affidavit gives no details, and none of the underlying circumstances, from which the officer reached this conclusion. *See Spinelli v. United States*, 1969, 393 U.S. 410, 416, 89 S.Ct. 584, 589, 21 L.Ed.2d 637; *Aguilar v. Texas*, 1964, 378 U.S. 108, 113, 84 S.Ct. 1509, 1513, 12 L.Ed.2d 723. *But see United States v. Harris*, 1971, 403 U.S. 573, 580–83, 91 S.Ct. 2075, 2080, 29 L.Ed.2d 723 (plurality opinion of Burger, C. J.)

The DEA agent approached them outside of the building, identified himself as a federal narcotics agent, and asked them to show him their airline ticket stubs and identification, which they did. The airline tickets had been purchased with the petitioner's credit card and indicated that the men had stayed in Fort Lauderdale only one day. According to the agent's testimony, the men appeared nervous during the encounter. The agent then asked them if they would agree to return to the terminal and to consent to a search of their persons and their shoulder bags. The agent testified that the petitioner nodded his head affirmatively, and that the other responded, "Yeh, okay." As the three of them entered the terminal, however, the petitioner began to run and before he was apprehended, abandoned his shoulder bag. The bag, when recovered, was found to contain cocaine.

*Reid v. Georgia*, —— U.S. ——, 100 S.Ct. 2752, 65 L.Ed.2d 890. The factors triggering DEA action, remarkably similar in kind to those present in the instant case, were that (1) the petitioner had arrived from Fort Lauderdale, which the agent testified is a principal place of origin of cocaine sold elsewhere in the country, (2) the petitioner arrived in the early morning when law enforcement activity is diminished, (3) he and his companion appeared to the agent to be trying to conceal the fact that they were travelling together, and (4) they apparently had no luggage other than their shoulder bags. *Id.* 100 S.Ct. at 2753. In vacating the judgment of the Georgia Court of Appeals, the Supreme Court concluded that

the agent could not, as a matter of law, have reasonably suspected the petitioner of criminal activity on the basis of these observed circumstances. Of the evidence relied on, only the fact that the petitioner preceded another person and occasionally looked backward at him as they proceeded through the concourse related to their particular conduct. The other circumstances describe a very large category of presumably innocent travellers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure. Nor can we agree, on this record, that the manner in which the petitioner and his companion walked through the airport reasonably could have led the agent to suspect them of wrongdoing. Although there could, of course, be circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot, see *Terry v. Ohio*, supra, at 27–28, 88 S.Ct. at 1883, this is not such a case. The agent's belief that the petitioner and his companion were attempting to conceal the fact that they were travelling together, a belief that was more an "inchoate and unparticularized suspicion or 'hunch,'" id., at 27, 88 S.Ct. at 1883, than a fair inference in the light of his experience, is simply too slender a reed to support the seizure in this case.

*Id.* 100 S.Ct. at 2753.

Although I accept the facts as set forth by the majority in the instant case,[1] I cannot in view of *Reid* concur in the inferences drawn. The salient facts in the instant case are: (1) the defendant arrived from Miami, a recognized source of cocaine; (2) the defendant's friend, Brooks, asked where the baggage of the Miami flight could be retrieved and, after moving his car to a parking lot adjacent to the baggage area, went to the lounge and had a couple of drinks while waiting for the plane; (3) Brooks scanned the concourse while appearing to make a telephone call; (4) the agents testified Brooks did not shake hands with the defendant when he met him; (5) the defendant and Brooks, the agents testified, entered adjacent phone booths and neither put coins into the phones; (6) on the way to the baggage carousel and while waiting for the luggage, Brooks and defendant were "constantly looking around"; and (7) the

---

1. I also recognize that without the benefit of findings of fact by the district court its denial of the motion to suppress is to be upheld if any reasonable view of the evidence supports it. *United States v. Payton*, 615 F.2d 922, 923 (1st Cir. 1980).

defendant appeared anxious and nervous when the agents questioned him.

I consider each factor in turn. That Viegas arrived from Miami, a city known to be a drug source, is as tenuous a reason to suspect him of criminal activity as it was in *Reid.* Such a circumstance, "describe[s] a very large category of presumably innocent travellers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure." *Id.* 100 S.Ct. at 2753. Further, I find it difficult to fathom why Brooks' inquiry about the location of the baggage depository should lead the agents to focus attention on him. Brooks' question could be expected from anyone meeting an incoming flight. That Brooks then drove his car from the upper level in the parking garage to the parking lot adjacent to the baggage area indicated nothing more except a desire not to have to carry luggage any further than necessary. The fact that Brooks returned to the lounge after reparking his car is also without significance. It is subsequent to this that the activities which have been construed to be suspicious commence. Brooks went to the gate and in the words of the majority "appeared" to place a phone call. During the time he was in the booth, he kept the door open and looked up and down the concourse. The inference is that he used the phone booth only for the purpose of detecting surveillance. He could, of course, have been telephoning while, at the same time, keeping a watchful eye for the arriving passengers from Miami. My brethren make a point of the fact that when Brooks met the defendant he did not shake hands with him; in the absence of any explanation of the significance of this, I fail to appreciate its relevance. This observation of the agents, it should be noted, was contradicted

by Brooks and, sometimes, these agents did not see things as they actually happened.

After the defendant and Brooks met, both men went into adjoining phone booths. The agents were positive that neither put any coins into the phones. Brooks proved through telephone records that he did call his home collect. My brethren explain the agents' mistake with the rationale that, because the call was collect, they could easily have missed seeing the coin inserted into the phone. I agree that even trained observers, as these agents supposedly were, make mistakes. But it is not for this court to provide justification for errors in observation of witnesses. I note parenthetically that if the majority were to consider all reasonable explanations for the agents' mistake, it should have recognized that DEA agents attempting to fit activities into a drug courier profile may sometimes see things that do not happen and fail to see things that do. Observations depend as much on the mind-set of the observer as they do on his eyes. This is not so much a criticism as it is a recognition of the foibles of the human condition to which we are all subject—an awareness which should make us ever more vigilant before sanctioning encroachments on personal freedom.

Although not specifically stated, it is clear that my brethren's assessment of reasonable suspicion is based mainly on the phone booth activities of Brooks and defendant. And, as they implicitly recognize, these were equally consistent with innocent behavior. I am not as willing as my brethren to allow actions consistent with innocent behavior to be transformed into suspicious criminal activity on the say-so of a police observer, no matter how well trained he may be.[2] The sanctioning of an intrusion of a constitutionally protected liberty

2. *United States v. McCaleb*, 552 F.2d 717 (6th Cir. 1977), does not stand for the proposition, as the majority opinion implies at p. 5, that the fact that defendant's actions were consistent with innocent behavior is of no consequence. The court in *McCaleb* found that there were no specific and articulable facts justifying an investigatory stop and noted in arriving at this conclusion: "The activities of the appellants in

this case observed by DEA agents, were consistent with innocent behavior." *Id.* at 720.

I disagree with the reasoning and conclusions of *United States v. Price*, 599 F.2d 494 (2d Cir. 1979), as to that portion of the opinion dealing with grounds for reasonable suspicion. It must also be noted that *Price* was decided before *Reid v. Georgia.*

should require more than the judgment call of the police.

That Viegas and Brooks were "constantly" looking around while going to the baggage carousel and waiting for defendant's luggage could, I agree, arouse some questions. But it is behavior that is similar to that which in *Reid* was not thought grounds for reasonable suspicion. In *Reid*, "[o]f the evidence relied on, only the fact that the petitioner preceded another person and occasionally looked backward at him as they proceeded through the concourse related to their particular conduct." *Id.* 100 S.Ct. at 2753. I fail to understand why the quantum of suspicion should be greater here than in *Reid*, as the majority argues, because Brooks and defendant glanced over their shoulder at no one in particular, whereas Reid was looking at one person.

There was certainly nothing suspicious in the answers that that defendant gave to the questions asked by the agents. And the license identification was, unlike the situation in *Mendenhall*, consistent with the name on the airline ticket.

There are two problems that I have with my brethren's recitation of defendant's physiological reactions when asked by the agents if he had drugs in his bag. The first is the failure to criticize, even impliedly, the fact that the agents deliberately lied to defendant during their questioning of him. I do not subscribe to the view that, even when combating something so insidious as drug traffic, the ends justify the means. More to the point, however, defendant's physical manifestations could not be considered on the question of whether there were reasonable grounds for suspecting him of criminal activity. The majority opinion is based on the assumption that defendant's person was seized at the initial contact. The defendant's reactions to the agent's question, like Reid's dropping of his bag and running, are not relevant to the inquiry.

The only factual difference between this case and *Reid* is the phone booth activities of Brooks and defendant. I realize that, as *Reid* and *Mendenhall* illustrate, the result in this kind of a case mainly depends on where

the court decides to draw the line. I am sure that the apprehension of drug couriers would markedly increase if the luggage of all passengers from a known "source city" were searched, or even if the search were restricted to those who were met at the plane and then used the telephone. The police, of course, have a duty to combat the terrible drug problem that besets our society. It is the court's duty, however, to preserve inviolate our constitutionally protected rights and liberties. Although, as the majority emphasized, the police intrusion here was slight, it was, in my opinion, unjustified and unconstitutional. I would reverse the denial of the motion to suppress.