UNITED STATES of America, Appellee,

v.

John H. REGAN, Defendant, Appellant.

No. 81–1722.

United States Court of Appeals,
First Circuit.

Argued April 7, 1982.
Decided Sept. 1, 1982.

**532**

Christopher J. Muse, Boston, Mass., with whom Robert F. Muse, Boston, Mass., was on brief, for defendant, appellant.

Charles T. Spurlock, Asst. U. S. Atty., Boston, Mass., with whom William F. Weld, U. S. Atty., Boston, Mass., was on brief, for appellee.

Before FAIRCHILD,* CAMPBELL and BOWNES, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

In several recent cases, this circuit has considered the constitutionality of airport encounters between drug agents and suspected drug couriers. *United States v. Jodoin*, 672 F.2d 232 (1st Cir. 1982); *United States v. West*, 651 F.2d 71 (1st Cir. 1981); *United States v. Viegas*, 639 F.2d 42 (1st Cir.), *cert. denied*, 451 U.S. 970, 101 .S.Ct. 2046 (1981). These precedents would dispose of the present case if it did not raise a further question, namely, how long may police detain a traveller's suitcase under a reasonable suspicion standard?

On March 18, 1981, at about 12:45 p. m., appellant John Regan and a male companion entered the Delta Airlines terminal at the Fort Lauderdale airport. Regan, who was walking with the aid of crutches, carried a small brown shoulder bag, and his companion carried a larger brown suitcase.

The two men walked to the Delta ticket counter and joined a line there.

Regan and his companion aroused the curiosity of two Broward County deputy sheriffs who were conducting an unrelated narcotics surveillance in the terminal. The deputies testified that Regan appeared to be very nervous, that he constantly scanned the interior of the terminal as if looking to see if he was being watched, and that his nervousness made them think that Regan might be engaged in transporting contraband. One of the two deputies assumed a position in line behind Regan and his companion, and noticed that Regan repeatedly glanced at the larger of the two suitcases.

When Regan reached the head of the line, the deputy sheriff heard him request a one-way ticket to Boston. The deputy also observed Regan make out two identification stickers which he attached to his suitcases before the ticket agent placed both bags on a conveyor belt. Both deputies testified that as Regan left the ticket counter to board his flight, he several times looked at the larger suitcase which was by then on the luggage conveyor belt. As Regan approached the escalator leading to the departure area, he and his companion exchanged goodbyes. The other man then departed the terminal while Regan mounted the escalator and continued toward his plane's departure gate.

The two deputies then took a closer look at Regan's suitcases. They noted the numbers on the baggage claim tickets and found the name on the identification stickers to be illegible. The deputies went to the departure gate where they observed Regan boarding a Boston-bound Delta flight which had been scheduled to depart at 1:00 p. m. The deputies testified that Regan had entered the terminal to buy his ticket and check in at only 12:45 p. m., 15 minutes before flight time. After the plane's departure, the two deputies returned to the Delta ticket area where they spoke with the ticket agent who had sold Regan his ticket. They learned that Regan had purchased his one-

* Of the Seventh Circuit, sitting by designation.

way ticket to Boston with cash and that Delta had no local telephone contact number for him. One of the deputy sheriffs then telephoned DEA special agent Sampson in Boston, summarized these observations, and suggested that the DEA agents continue the surveillance upon Regan's arrival in Boston.[1]

Upon receipt of this information, agent Sampson contacted DEA special agent Lemon and state police officer Palombo and in their company proceeded to observe the disembarkation of the Delta flight. Regan, using his crutches as support, was one of the last passengers to leave the plane.[2] He was met by a woman, later identified as Celinda Kaye, who greeted him with a kiss.

At this point the three law enforcement officers split up, agent Sampson going to identify Regan's luggage as it was unloaded and agent Lemon and officer Palombo remaining in the terminal and continuing their surveillance of Regan and Ms. Kaye. During this period of surveillance, agent Lemon and officer Palombo noticed that as they followed Regan and Ms. Kaye to the baggage claim area, Regan, on three occasions looked back over his shoulder as if trying to detect whether he was being followed. Just prior to their arrival at the baggage claim area, the two officers observed Ms. Kaye leave the terminal. Regan continued to the baggage claim area and eventually halted near one end of the baggage conveyor apart from the other passengers waiting to retrieve their luggage. At this point, agent Sampson rejoined the two

men and all three continued to observe Regan. The officers noticed that as Regan waited for his luggage, he periodically scanned the baggage area in a manner which to them suggested that he was trying to detect surveillance. When Regan's bags were placed on the conveyor belt, Regan removed them from the belt, put both crutches under one arm and, after first presenting his baggage claim checks to the security guard, proceeded to leave the baggage claim area with the bags.

As Regan approached the glass doors leading out of the terminal to the street, agent Sampson approached him from the right, identified himself as a DEA agent, presented his credentials and asked Regan if he would mind speaking with the two DEA agents for a few minutes. Regan turned around, placed the larger suitcase on the floor, and replied, "Sure." Sampson and Lemon, who were both dressed in street clothes, flanked Regan, with each officer standing at about two or three feet away from either side. Trooper Palombo, who was also dressed in street clothes, stood about ten feet away from the group of men.

In response to questions from agent Sampson, Regan stated that he had just returned from a four-day pleasure trip to Fort Lauderdale. When asked if he would show his plane ticket to the agents, Regan reached into his pocket, pulled out a small number of bills but was unable to locate his plane ticket. He explained his inability to produce the ticket by stating that he must have left the ticket on the plane.[3] When

---

1. Deputy Brennan testified that in airport narcotics investigations one of the things he was trained to observe "would be a last minute arrival at the airport, cash one-way tickets, a particular amount of attention paid to a piece of luggage" and illegibly written identification tags. According to Brennan, "unusual nervousness is probably the first thing that we try to pick out." The deputy testified that Boston was a receiving city for a lot of narcotics from Fort Lauderdale. Deputy Brennan testified he had been assigned to the airport for about three years, during which he had been involved in 150 successful narcotics investigations of a type similar to this one. He testified that Regan's conduct stood out because while most people were interested "in flight times and get-

ting their tickets and things of that nature," Regan seemed more concerned with the people around him and looking around at the people in the terminal. Brennan testified that if he had not been conducting another investigation, he felt strongly enough about Regan's actions to have spoken to him in Fort Lauderdale. As it was, he contacted Boston and asked people there to continue the investigation.

2. There was testimony that this late exit was consistent with the profile of a drug courier as couriers often delay leaving the plane in order to be sure the coast is clear.

3. As the district court noted, it might seem more than coincidental that Regan had man-

agent Sampson asked Regan for some identification, Regan produced a Massachusetts driver's license made out in his name. The agents examined the license and promptly returned it to Regan.

At this point, Regan asked the agents what the problem was. Agent Sampson responded that the agents were conducting a narcotics examination and asked Regan if he carried any drugs in his bag. Regan stated that he had some prescription drugs and, without being asked, unzipped the smaller bag and tendered three prescription bottles to the agents. Agent Lemon then informed Regan that the agents were not talking about prescription drugs but were looking for drugs like cocaine and marijuana. Regan, according to the agents, paled and his hands began to shake; however he told the agents that the larger suitcase contained only clothes. Agent Lemon then asked Regan if he would permit the agents to examine the contents of the bag, advising him that he could refuse if he wished. Regan replied that he did not want the agents to look in the bag, and that it was locked. He inquired what would happen if he refused. Agent Sampson responded that Regan was free to leave, but that the agents intended to have a narcotics detection dog examine the bag. The agent went on to say that if the dog "alerted" to the bag, thereby indicating the likely presence of illegal substances, the agents intended to apply for a search warrant. When Regan asked if he would have to wait while the procedure was performed, the agents informed him that he was free to leave and that if he chose to leave, he would be given a receipt for his bag. Regan stated that he would prefer to leave the bag and agreed to accompany the agents to the DEA office in the terminal in order to obtain a receipt.

At this point, Celinda Kaye arrived in the baggage claim area, saw Regan with the

agents and attempted to avoid being seen by walking behind two mailboxes and a glass display case. While agent Sampson and Regan continued their discussion, agent Lemon, accompanied by trooper Palombo, walked over to where Ms. Kaye was standing and identified themselves. When the two men asked Kaye if she knew Regan, Ms. Kaye replied that she had never seen him before in her life. However, after agent Lemon informed Kaye that he had seen her meet Regan upon his arrival at the airport, Ms. Kaye admitted that she worked with Regan and had come to the airport to drive him home. When asked for identification, Ms. Kaye stated that she had left her identification in her car which was parked outside the terminal. Agent Lemon then asked if he could check her pocketbook for weapons. Although Ms. Kaye at first refused to permit the search, upon Lemon's continued insistence, she consented. The search revealed no weapons. Agent Lemon and officer Palombo then accompanied Ms. Kaye to her car where she produced her license and registration. After a routine check of the license and registration disclosed no problems, Ms. Kaye was advised that she was free to go. Agent Lemon and officer Palombo then proceeded to the DEA office, and Ms. Kaye reentered the terminal to wait for Regan.

While agent Lemon and officer Palombo were questioning Ms. Kaye, agent Sampson and Regan had proceeded to the DEA office on the third floor of the terminal building. Upon their arrival at the office, Sampson called the U. S. Customs office and learned that the dog handler was off duty and would not be available until the following day.[4] Agent Sampson then asked Regan to once again produce his license and the prescription vials which he earlier had shown to the agents. After agent Sampson had

___

aged to hold on to his baggage checks, which are usually stapled to the ticket, but had discarded the ticket. It was, of course, also strange that if he had been visiting in Florida for four days on a pleasure trip he would have returned via a one-way air ticket purchased for cash at the last minute.

4. The Drug Enforcement Agency apparently had no narcotics detector dog of its own in Boston at this time. When the need arose, the DEA would borrow the services of the detector dog owned by the U. S. Customs Service. The dog, of course, required the presence of his own handler.

taken down information from these items,[5] he returned them to Regan. He also gave Regan a receipt for the suitcase and a telephone number to contact in case he had any questions concerning the detained bag. Agent Sampson did not tell Regan when he could return to pick up the bag. Regan then left the DEA office, rejoined Ms. Kaye in the baggage claim area and left the airport.

Later that afternoon, agents Lemon and Sampson took Regan's suitcase to the Boston DEA office where it was placed in an evidence vault. The next day, March 19, 1981, Lemon and Sampson removed the suitcase from the vault and took it back to the DEA office at Logan Airport where they met with U. S. Customs Inspector Le-Fevre, the handler of the Customs Service's detector dog, "Harvey." Twenty-two hours after the bag had been detained at Logan Airport, Customs Service detector dog "Harvey" was brought to the door of the DEA office. The dog went directly to Regan's suitcase and alerted (barking and pawing at the bag), thereby signalling the presence of illegal drugs. On the basis of a four-page affidavit reciting substantially these facts, a U. S. Magistrate issued a search warrant. The subsequent search of the bag revealed that the suitcase contained approximately four and one-half ounces of cocaine.

An indictment was filed charging Regan with possession with intent to distribute. Prior to trial, Regan filed a motion to suppress the evidence seized during the search of the suitcase. A three-day hearing was held before the district court during which witnesses testified to the events leading up to the detention of the suitcase. At the close of the hearing, the district judge made extensive findings and rulings, and denied Regan's motion to suppress. On appeal from the conviction that followed, Regan challenges denial of this motion.

Regan presents two arguments on appeal. First, he argues that the three officers' initial contact was a seizure made without the "reasonable suspicion" required in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The district court ruled otherwise, holding that Regan's person was not seized. It found that a reasonable person would not have believed he was not free to leave, and that there had been no intimidating show of authority.

■ This court has already described, and we need not repeat, the standards for determining when a "seizure" takes place. *Jodoin*, 672 F.2d at 234; *West*, 651 F.2d at 72–73; *Viegas*, 639 F.2d at 44–45. Police officers, like other citizens, are free to initiate and engage in conversations with citizens. It is only when the police officer either "by means of physical force or show of authority has in some way restrained the liberty of a citizen...," *Terry v. Ohio*, 392 U.S. at 19 n.16, 88 S.Ct. at 1879 n.16, that permissible voluntary interaction becomes transformed into a fourth amendment seizure.

■ The district court found that the two agents, dressed in business suits, approached defendant as he was walking towards the exit; that they displayed no weapons; that they did not order him to stop or the like; that he said "sure" when asked if he would speak with them; and that while an agent assumed a position on either side of him; they did not block his path, touch him, or in any way physically restrain his freedom of movement. The court specifically did not credit Regan's claim that his driver's license was retained, compelling him to come to the DEA office to reclaim it. These and related findings were not clearly erroneous. *See United States v. Jobin*, 535 F.2d 154, 156 (1st Cir. 1976) (findings after suppression hearing are binding on appeal unless clearly erroneous). Regan's own testimony, and his conduct during the encounter, such as his refusal to permit his larger bag to be searched after being told he could refuse, tend to support the district court's conclu-

---

**5.** Later that afternoon this information was used to conduct a "missing and wanted" check which disclosed no noteworthy information.

sion that he was not intimidated nor placed under restraint. We accordingly sustain the lower court's finding that a seizure did not occur.

■ We also affirm the district court's alternative conclusion that, even assuming a seizure occurred, it would have been fully warranted by reasonable suspicion. Police officers having a reasonable and articulable suspicion that a person is engaged in illegal activity may conduct a brief stop to investigate. *See United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981); *Reid v. Georgia,* 448 U.S. 438, 440, 100 S.Ct. 2752, 2753, 65 L.Ed.2d 890 (1980) (per curiam); *Brown v. Texas,* 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979); *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889; *United States v. Jodoin,* 672 F.2d at 234; *United States v. Viegas,* 639 F.2d at 44–45. This is so despite the absence of probable cause, which would be necessary to support an arrest. The difference between the standard used to evaluate investigative stops and the standard used to evaluate arrests arises from the view that the limited intrusion occasioned by a brief stop, when balanced against the public interest in preventing crimes, justifies the application of the lesser standard in these limited circumstances. *Brown v. Texas,* 443 U.S. at 50–51, 99 S.Ct. at 2640–41; *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Delaware v. Prouse,* 440 U.S. 648, 654–55, 99 S.Ct. 1391, 1396–97, 59 L.Ed.2d 660 (1979); *United States v. Brignoni-Ponce,* 422 U.S. at 878, 95 S.Ct. at 2578–79.

The officers here articulated clear and reasonable facts for their decision to stop and question Regan before he left the airport. These included Regan's nervousness both in Fort Lauderdale and Boston, his late arrival for the plane, his purchase of a one-way ticket with cash, the attention he paid to the larger suitcase, and his continual scanning of both airports in an apparent attempt to detect surveillance. In assessing the import of such evidence, a court gives "due credit . . . to the experience and expertise of the officers." *United States v. Viegas,* 639 F.2d at 45. *See United States v. Jodoin,* 672 F.2d at 235.

To be sure, somewhat similar but, we think, less specific and impressive facts, were held insufficient to warrant a stop in *Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890. The Court there concluded that the agent's suspicion that the defendant and his companion were drug couriers was "more an 'inchoate and unparticularized suspicion or hunch,' than a fair inference in the light of [the agent's] experience [and that as such it provided] too slender a reed to support the seizure . . . ." *Id.*

Here, Regan was under closer observation by police both in Florida and Boston. His conduct in Fort Lauderdale was particularly suspicious, leading the deputies to telephone DEA agents in Boston. We believe the district court properly concluded that the government had established the presence of a reasonable and articulable suspicion such as would have warranted a brief investigative stop.

A different and more difficult problem is posed by Regan's argument that even if the encounter, whether or not termed a "stop," initiated by the agents was constitutional, the detention of his suitcase for 22 hours before obtaining a search warrant amounted to an unreasonable seizure of his property which violated the fourth amendment.

The only serious issue presented by this argument concerns the duration of the detention. We have previously held that reasonable suspicion forms a sufficient ground for police to detain temporarily an airport traveller's luggage for exposure to a detector dog. *United States v. West,* 651 F.2d at 74; *United States v. Viegas,* 639 F.2d at 45. *Cf. United States v. Jodoin,* 672 F.2d at 235 (lengthier detention upheld when based on probable cause). In both *West* and *Viegas* we rejected the contention that probable cause was required for the detentions involved in those cases. We reaffirm our holdings that the minimal nature of the

intrusion in such circumstances is reasonable under the fourth amendment where founded upon reasonable suspicion.

Neither *West* nor *Viegas*, however, considered the problem of when the period of detention might be so lengthy as to become more than "temporary" and thereby unreasonable in the absence of probable cause.[6] The Second Circuit confronted the issue squarely in *United States v. Place*, 660 F.2d 44 (2d Cir. 1981), *cert. granted*, —— U.S. ——, 102 S.Ct. 2901, 73 L.Ed.2d 1312 (1982). In *Place*, the court held that a baggage detention of almost two hours based only on reasonable suspicion violated the fourth amendment. The court reasoned that, to be constitutional, the detention of a bag on less than probable cause must be justified under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), as a brief investigative stop. 660 F.2d at 50–52. The two-hour detention, the court stated, "cannot reasonably be characterized as a *Terry*-style 'investigative stop.'" *Id.* at 52.

We are persuaded by the reasoning of *Place* to the extent that we think the 22-hour detention of Regan's suitcase violated the fourth amendment. We need not, and given our own precedent do not, adopt *Place*'s conclusion that a two-hour detention would necessarily be unconstitutional. It is a difficult problem to define with precision the maximum period of luggage detention that would be justified on the basis of reasonable suspicion.[7] It is enough for this case, however, to conclude that a 22-hour detention is so great that it simply cannot be justified as the type of brief investigatory stop permitted under *Terry*, even recognizing that detention of a bag is a lesser intrusion than that of a person, *see infra.* *Terry* is a narrow exception to the usual requirement of probable cause. *Dunaway v. New York*, 442 U.S. 200, 210, 99 S.Ct. 2248, 2255, 60 L.Ed.2d 824 (1979). Its justification lies in the minimal nature of the brief intrusion compared with the substantial public interests served thereby. *Terry*, 392 U.S. at 20–27, 88 S.Ct. 1879–83; *Dunaway*, 442 U.S. at 208–10, 99 S.Ct. at 2254–55. Forcible detention of a traveller's bag for nearly 24 hours can scarcely be considered a minimal intrusion. A rule permitting such a lengthy detention without probable cause would open the door to serious abuses visited upon the travelling public, since the concept of reasonable suspicion necessarily invests considerable discretion in the detaining officers. We realize that when Celinda Kaye denied knowing Regan, the reasons for suspecting him greatly increased, but the evidence was still below the threshold of probable cause. A rule allowing *long-term* baggage detentions on anything less than probable cause seems to us simply too dangerous to be accepted.

It is true that *Terry* concerned a stop of a person, which generally presents a greater intrusion than the detention of a person's effects; similarly, the detention of a suitcase is a lesser intrusion than a search through its contents. *See United States v. Chadwick*, 433 U.S. 1, 13–14 n.8, 97 S.Ct. 2476, 2484–85 n.8, 53 L.Ed.2d 538 (1977); *United States v. Viegas*, 639 F.2d at 45; *United States v. Place*, 660 F.2d at 55 (Kaufman, J., dissenting). This has led courts—including this one—to rely in luggage detention cases on *United States v. Van Leeuwen*, 397 U.S. 249, 90 S.Ct. 1029, 25 L.Ed.2d 282 (1970), which concerned de-

---

**6.** Our opinions in these cases do not indicate the length of time during which the bags were detained. The district court opinion in *West* states that the detector dog arrived and alerted to the bag within "about one hour" after the defendant was first stopped in the airport. 495 F.Supp. 871, 873 (D.Mass.1980). The district court made no findings in *Viegas*. In *Jodoin*, 672 F.2d at 235, we upheld a three to four-day detention but only after determining that probable cause existed for the seizure. The *Jodoin* court said, "Because these facts satisfy the higher standard of '*belief*' we need not consider whether because of the *length of time* of the detention of the suitcase, it would have been unlawful if supported only by '*reasonable suspicion*'—an issue which, while not specifically raised here, has bothered the courts of appeals for other circuits." *Id.* (Emphasis in original.)

**7.** The Supreme Court may provide more guidance on this issue when it decides *United States v. Place*, on which it has granted *certiorari*.

tention of first class mail, rather than to rely directly on *Terry*. *See United States v. Viegas*, 639 F.2d at 45; *United States v. Corbitt*, 675 F.2d 626, 629 (4th Cir. 1982); *United States v. Martell*, 654 F.2d 1356, 1359–61 (9th Cir. 1981), *cert. petition filed*, 50 U.S.L.W. 3803 (Mar. 15, 1982); *United States v. Klein*, 626 F.2d 22, 25–26 (7th Cir. 1980). In *Van Leeuwen*, the Court upheld a warrantless 29-hour detention of two suspicious packages after they had been deposited at a post office as first class mail. The Court reasoned that "[n]o interest protected by the Fourth Amendment was invaded by forwarding the packages the following day rather than the day they were deposited." 397 U.S. at 253, 90 S.Ct. at 1032. It may be argued that this result controls the 22-hour detention of Regan's suitcase, and mandates that we uphold this detention.

We do not believe, however, that *Van Leeuwen* is sufficiently apposite to be controlling. We agree with the Second Circuit's reasoning in *Place* that the detention of mail after it has left the sender's custody and control is far less intrusive than the detention of a suitcase in the possession of an air traveller, who may be thousands of miles from home and in need of the personal effects contained in the bag. *See* 660 F.2d at 52–53. Moreover, even the Court in *Van Leeuwen* averted to *Terry* and the possibility that a mail detention could become so lengthy as to be unconstitutional. *See* 397 U.S. at 252, 90 S.Ct. at 1032. The lesson we glean from *Van Leeuwen* is not that the principles in *Terry* are irrelevant to the detention of a person's effects as opposed to the stop of his person, but that the lesser fourth amendment interest involved in the former situation will justify a somewhat more lengthy detention under the *Terry* rationale than in the latter case. It is for this reason that we do not limit the duration of the detention of luggage as strictly as the *Place* court.

Applying this analysis to the present circumstances does not change our conclusion that a 22-hour detention of a person's luggage is, when based on reasonable suspicion alone, unreasonable under the fourth amendment. The magnitude of the intrusion, while certainly far less than for a similar detention of an individual, is greater than that involved in delaying mail that is already posted. Moreover, on the other side of the balance, we believe that the government can adequately protect its interest by ensuring that detector dogs are more readily available so that baggage checks can be conducted expeditiously. *Cf. Van Leeuwen*, 397 U.S. at 252–53, 90 S.Ct. at 1032–33 (warrants were obtained as soon as possible.).[8]

Our ruling should in no way hamstring law enforcement efforts directed at curtailing the movement of drugs through our nation's airports. Suspects may be stopped and their bags briefly detained on the basis of reasonable suspicion. A temporary detention sufficient for the bags to be checked by a detector dog on or near the premises will be permitted. This rationale is, however, unavailing to support the 22-hour detention of Regan's bag. The evidence discovered in that bag should therefore have been suppressed.

*Reversed.*

---

8. We recognize that the officers acted in good faith, and that unanticipated delays—a sick dog, a vacationing handler—may delay an otherwise expeditious procedure. But we think the burdens stemming from these must be borne by the police given the low threshold of cause to detain the bag. Were the rule otherwise—were delays of one, two or more days to be accepted by courts—drug enforcement personnel might use only one detector dog to service an entire metropolitan area, and suitcases might be piled high in the security room awaiting the dog's weekly or bi-monthly rounds. We think that where the only basis for holding luggage is reasonable suspicion, expeditious action is essential.