UNITED STATES of America, Plaintiff-Appellee,

v.

Cesar MOYA, Defendant-Appellant.

No. 81–2225.

United States Court of Appeals, Seventh Circuit.

Submitted Nov. 10, 1982.*

Decided March 22, 1983.

Rehearing Denied June 16, 1983.

appellant's motion and this appeal was submitted on the briefs and record.

L. Mark Dachs, Miami, Fla., for defendant-appellant.

Dan K. Webb, U.S. Atty., Ira H. Raphaelson, Asst. U.S. Atty., Chicago, Ill. (Robert W. Tarun, Asst. U.S. Atty., Chicago, Ill., of counsel), for plaintiff-appellee.

Before CUDAHY and COFFEY, Circuit Judges, and SWYGERT, Senior Circuit Judge.

COFFEY, Circuit Judge.

Cesar Moya appeals his conviction in the United States District Court for the Northern District of Illinois, Eastern Division, for possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). Moya contends that the trial court erred in denying his motion to suppress the cocaine the law enforcement officers discovered during a search of his travel bag. His claim is based upon an airport encounter and subsequent detention of his shoulder bag. Moya contends the seizure was unreason-

able and violated his Fourth Amendment rights. We hold that Moya's contentions are without merit and affirm the conviction.

On March 20, 1980, Drug Enforcement Administration ("DEA") Agent Kenneth Labik and Chicago Police Officer Thomas Kinsella were stationed at O'Hare International Airport monitoring the arrival of airline passengers on flights from certain "source cities" in an effort to control the flow of illegal drugs. Because the DEA had informed Labik and Kinsella that Miami, Florida was a source city for much of the illegal drug traffic into Chicago, the law enforcement officers observed the passengers deplaning from Delta Airlines Flight 142 upon its arrival from Miami at 7:35 p.m. The officers observed Cesar Moya, carrying a shoulder bag, exit the arrival gate and walk several feet in a direction away from the main terminal, whereupon Moya stopped and positioned himself against the wall momentarily, looking in all directions. Moya then walked down the concourse toward the main terminal, frequently looking backwards over his shoulder. During this time, Agent Labik and Officer Kinsella kept Moya under observation while they followed him. Upon reaching the junction of two concourses, Moya stood off to one side and, again, looked in all directions. Moya then walked into an adjoining hallway and entered a public restroom, followed by Officer Kinsella. Moya checked all of the enclosed stalls and, discovering that they were all occupied, exited the restroom and proceeded to the main terminal building, where he entered another public restroom, this time followed by Agent Labik. When he found an open stall, he entered it, closed the door, stood there for several minutes and left without using the facilities. Upon exiting the restroom, Agent Labik next observed Moya standing between the main doors of the terminal building and the escalator opposite the Delta Airlines ticket counter. As soon as the two made eye contact, Moya boarded a down-escalator followed by Labik and Kinsella. Upon reaching the arrival area of the terminal, Moya did not go to the baggage area, but exited the terminal and entered a cab line carrying the shoulder bag, his sole piece of luggage.

As he was standing in the cab line, Moya was approached by Labik and Kinsella, who promptly identified themselves as law enforcement officers and asked Moya if they could speak with him. Moya agreed and the officers proceeded to ask Moya for some identification. Moya denied having any identification, but agreed to move back inside the terminal building in order to avoid the night chill and the pedestrian traffic while talking to the officers. The officers and Moya entered the main terminal building and situated themselves in a public area between the primary and secondary sets of exit doors where the questioning resumed.

Moya again was asked his name and replied "Cesar Moya" and was next asked to display his airline ticket. He produced a one-way ticket on Delta Flight 142 in the name of Cesar Moya. After examining the ticket, Labik asked Moya for further identification to which Moya responded by asking what the questioning was "all about." Agent Labik ignored Moya's inquiry and, again, asked for other identification. Moya responded by reaching into a side pocket of his shoulder bag and producing a driver's license in his name (Moya) with his picture thereon. In reaching into the pocket, Moya gave Labik a view of a corner of a clear plastic bag. After making this observation, Agent Labik asked the defendant to remove the plastic bag. Moya replied that he had no plastic bag and Labik told him that if he (Moya) did not remove the plastic bag, he (Labik) would. Moya removed the bag which contained several other clear bags, some small bottles and some small spoons. Moya explained that he used the contents of the bag to carry jewelry. Agent Labik, however, recognized the contents of the bag as drug paraphernalia.

Agent Labik and Officer Kinsella then asked Moya's permission to search the travel bag and advised him that he had a right to refuse. Moya refused and freely departed the terminal alone while the officers detained the bag in order to attempt to

obtain a search warrant. The officers then contacted the U.S. Customs office and requested the services of a dog trained to detect the existence of narcotics by "sniff testing." Approximately three hours later, the trained canine picked out Moya's shoulder bag from among a line up of six similar bags. On the basis of this showing, a search warrant was obtained from a Cook County, Illinois Circuit Court judge. The defendant does not dispute the validity of the warrant. The search of the bag revealed that Moya had 501.77 grams of 35% cocaine in his possession. According to uncontested testimony adduced at the suppression hearing, this is more cocaine than one person would normally have for his personal use and has a street value of between $40,000 and $50,000.

## I.

The central issue in this case is whether or not the seizure of Moya's bag was constitutionally permissible. If that seizure was permissible, then, as Moya admits, the ultimate search of the bag was proper and the evidence obtained was admissible. If, however, the seizure was improper, he contends the evidence obtained from searching the bag was "fruit of the poisonous tree" and, as such, should have been suppressed. *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). Consequently, as noted by the district court, the propriety of the seizure turns on two questions:

> (A) Did the questioning of Moya by Agent Labik and Officer Kinsella in a public area of O'Hare International Airport amount to a "seizure" in violation of his Fourth Amendment rights?

> (B) If the circumstances of the questioning did not give rise to an unconstitutional seizure, did anything that came to light during the course of the questioning, when taken in conjunction with Moya's previous behavior, justify seizure of his travel bag?

## A.

■ In determining whether a police-citizen encounter violated a defendant's Fourth Amendment rights, the court must first de-termine whether the encounter was a "seizure" within the meaning of the Fourth Amendment. *See United States v. Mendenhall,* 446 U.S. 544, 553, 100 S.Ct. 1870, 1876, 64 L.Ed.2d 497 (1980) (Stewart, J.) (with Rehnquist, J., concurring). Although the Supreme Court has recognized that the Fourth Amendment proscription against unreasonable searches and seizures "applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest," *United States v. Brignoni-Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975), the Court also has recognized that "not all personal intercourse between policemen and citizens involves 'seizures' of persons." *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968).

This circuit has adopted Justice Stewart's "reasonable person" test for determining whether seizures have occurred in airport surveillance cases such as the one before us. *See United States v. Black,* 675 F.2d 129, 134 (7th Cir.1982), *petition for cert. filed,* 51 U.S.L.W. 3026 (U.S. June 3, 1982) (No. 81–2239). In *Mendenhall,* Justice Stewart, joined by Justice Rehnquist, concluded:

> "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."

*Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877. Numerous other circuits have also adopted Justice Stewart's test. *See Black,* 675 F.2d at 134 and cases cited therein. As noted in this court's opinion in *Black:*

> "Imposition of an objective standard requiring the presence of circumstances which indicate that that freedom to disregard has been obumbrated properly provides a reliable basis on which the court may determine whether valuable liberty interests have been infringed, without hamstringing the ability of the police to engage in some modicum of legitimate contact with the citizenry."

*Id.* at 134.

■ The determination whether an encounter between a defendant and law en-

forcement officers rises to the level of a seizure under the "reasonable person" test is a highly factual one, dependent on the circumstances of the particular case. "Our standard of review is accordingly limited to inquiry into whether the decision of the district court is clearly erroneous, and requires that particular deference be given to the district judge who had the opportunity to observe the testimony and demeanor of [the witnesses]." *Id.* at 134.

■ In determining whether a given police-citizen encounter constitutes a seizure in the context of airport surveillance, the courts have looked at a variety of factors. The inquiry has focused on three major areas: (1) The conduct of the police; (2) The person of the individual citizen; and (3) The physical surroundings of the encounter. *Id.* at 134.

■ In examining the conduct of the police in a particular case, courts have sought to determine whether "the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen such as he is not free to walk away." *Id.* at 134. The district court here found that no physical force or show of authority was used to detain Moya. In its opinion, the district court determined:

"[T]he undisputed testimony shows that Labik and Kinsella did not engage in any show of force in approaching Moya, that they did not lay hands on him at any time, and that Moya showed no hesitancy in agreeing to respond to their questions or agreeing to remove himself from the taxi line and enter the terminal foyer. Moreover, Moya himself characterized the officers' tone of voice and attitude as 'relaxed' throughout the encounter. While Moya did testify that, at one point, he was barred from leaving, Labik directly and expressly contradicted this testimony. The court finds Labik's account

the more credible. On the whole, Labik gave a more precise, detailed narrative of the relevant events. Moreover, his was an account that was largely corroborated by Kinsella's testimony and by the affidavit filed in support of the search warrant that was ultimately issued in this case. Finally, as a law enforcement officer, Labik is an experienced and trained observer whose memory can be given particular credence. Given all of these circumstances, it is apparent that Moya would have been free to walk away from Labik and Kinsella at any time, that a reasonable man in his position would have realized this, and, therefore, that his participation in the questioning was entirely voluntary. Under these circumstances, no constitutionally cognizable seizure can be said to have taken place."

We hold that the district court's finding on this question of fact is not clearly erroneous and we affirm the court's determination that Moya's freedom was not restrained by an overbearing show of authority. *Id.* at 135.

The characteristics of the individual defendant are another factor for the court to consider in determining whether even a facially innocuous encounter might, under the circumstances, have overborne the citizen's freedom to walk away. Here, there is no evidence suggesting that Moya was "so naive or vulnerable to coercion that special protection from police contacts was required by the Fourth Amendment." [1] *Id.* at 135.

A final element to be considered under this court's *Black* decision in determining whether a police-citizen encounter was voluntary or coerced is the physical setting in the area where the encounter took place. Here, the initial encounter between Moya and the officers occurred on a public side-

1. Considering this factor, the district court's opinion recited, in pertinent part:

"Along the same lines, it is worth noting that Moya did not feel compelled to comply with all of the agents' requests and that they did not insist that he do so. Thus, for example, Moya testified that he was asked to permit the agents to inspect his boots. He refused to do so, and this refusal was honored. Again, the agents asked Moya's permission to search his shoulder bag. He refused to give them permission and no search occurred until a warrant was subsequently obtained."

walk with other travelers present. Next, the officers requested him to move into the nearby terminal foyer away from the flow of pedestrian traffic and the night chill and Moya readily acquiesced. This movement of eight-ten feet into the public terminal did not result in Moya's isolation, restraint or any sort of quasi-imprisonment, and was therefore of no legal significance as he was free to walk away from the officers at any time and, in fact, subsequently did walk away. Based on the factors outlined by this court in *Black,* we affirm the district court's conclusion that no seizure occurred during the "personal intercourse" between Moya and the law enforcement officers and a "reasonable person" would have believed that he was free to leave.

### B.

■ Moya's second contention is that the detention of his shoulder bag was an unconstitutional seizure of his personal property. It is clear from a reading of this court's decision in *United States v. Klein,* 626 F.2d 22, 25–26 (7th Cir.1980), that the law of this circuit is that reasonable suspicion that luggage contains contraband is sufficient to justify temporary detention of the baggage in an airport courier situation. *Accord United States v. Corbitt,* 675 F.2d 626, 629 (4th Cir.1982); *United States v. Viegas,* 639 F.2d 42, 45 (1st Cir.), *cert. denied,* 451 U.S. 970, 101 S.Ct. 2046, 68 L.Ed.2d 348 (1981); and *United States v. Martell,* 654 F.2d 1356, 1359–61 (9th Cir.1981), *petition for cert.*

filed, 50 U.S.L.W. 3803 (U.S. March 15, 1982) (No. 81–1772).[2]

The appellant argues that the facts known by Agent Labik and Officer Kinsella at the time they improperly seized the plastic bag from Moya were insufficient to create a reasonable suspicion in the minds of the officers that the shoulder bag contained contraband.[3] The trial court determined that the officers did not have sufficiently well supported suspicions regarding Moya to support a seizure of the bag at the time they initially approached him in the taxi line prior to any questioning. However, during the subsequent interview, according to the trial court, the following additional facts were adduced justifying detention of the luggage:

"The first question addressed to Moya at the time he was standing in the cab line was a request for identification. Moya's contention that he had none was, of course, suspicious in itself. The suspicious nature of this response is underlined when a subsequent request for identification in the building foyer led Moya to produce his driver's license, thus giving lie to his initial statement.... In addition to dissembling about his possession of identification, one additional event during the questioning gave Labik and Kinsella reasonable grounds for suspecting that Moya was engaged in a criminal enterprise. When Moya finally reached into the pocket of his travel bag to produce his license, Labik glimpsed a corner

2. The appellant urges us to follow the Second Circuit's decision in *United States v. Place,* 660 F.2d 44 (2d Cir.1981), *cert. granted,* 457 U.S. 1104, 102 S.Ct. 2901, 73 L.Ed.2d 1312 (1982). As this opinion is contrary to the established precedent of this circuit and others, we decline to find *Place* controlling. *See Place,* 660 F.2d at 56 n. 2 (Kaufman, J., dissenting) and *United States v. Regan,* 687 F.2d 531, 538 (1st Cir. 1982).

3. The district court determined that the seizure of the plastic bag subsequent to Agent Labik's demand that Moya remove it from his travel bag was illegal. The court further determined that because the officers had an independent basis for detaining the luggage "suppression of this evidence [based on Labik's demand] would not be consonant with the policies that underlie

the fruit-of-the-poisonous-tree doctrine and its various limitations." The appellant does not take issue with the district court's application of the exclusionary rule and we, therefore, need not review the court's interpretation. The appellant correctly notes that "the lower court declined to take this factor [possession of narcotics paraphernalia] into consideration" in reviewing the propriety of the seizure of the shoulder bag. Moya argues that "this Honorable Court should conclude that Labik *at no time* had reasonable grounds to seize the Defendant's luggage." Accordingly, we only address the propriety of the detention of Moya's shoulder bag on the basis of the information available to the officers prior to the seizure of the plastic bag.

of a clear plastic bag. He promptly asked Moya to remove this bag and show it to him. Moya did not simply refuse to comply with this request, rather he insisted that no plastic bag existed. This was a lie and Labik knew that it was the moment it was uttered. Thus, by the time that Moya initially failed to produce the plastic bag, he had given Labik and Kinsella several grounds for suspecting that his travel bag contained contraband: His behavior in walking from the arrival gate to the taxi stand was sufficient to arouse the officers' inchoate suspicions. After they approached Moya and began to question him, these inchoate suspicions have been sharpened by the disclosure that Moya was hesitant to provide them with information about his identity and by the disclosure that Moya was carrying a plastic bag whose contents he wished to keep a secret. While this information taken as a whole may not have amounted to probable cause to believe that the bag contained contraband, it certainly gave Labik and Kinsella 'reasonable and articuable' grounds for suspecting that this was the case."

■ The officers were entitled to assess the totality of Moya's conduct in light of their own experience. Among the circumstances that can give rise to reasonable suspicion are the officers' knowledge of the methods used in drug courier activity, characteristics of persons engaged in such illegal practices, the behavior of a suspect who appears to be evading police contact and the suspect's efforts to conceal the truth during a police-citizen encounter. *See Mendenhall,* 446 U.S. at 563, 100 S.Ct. at 1882 (Powell, J., concurring).

■ We affirm the district court's determination that the officers had a reasonable suspicion to believe that Moya's travel bag contained contraband even before Moya turned the plastic bag over to them. The officers' curiosity was initially aroused by: (1) Moya's initial movement away from the main terminal after deplaning; (2) Moya removing himself from the flow of pedestrian traffic and surveying the concourse in all directions in a manner consistent with trying to detect surveillance; (3) While Moya walked to the terminal he frequently glanced behind him, as if trying to detect whether he was being followed; (4) Moya entered two public restrooms without utilizing the facilities; (5) Moya, a second time, removed himself from the pedestrian traffic and surveyed the entire surrounding area; and (6) Moya hurriedly exited the main terminal carrying only his shoulder bag. The information recited above by the district court, gleaned during the constitutionally permissible initial encounter, viewed in conjunction with Moya's uneasy, furtive and hesitant movement through the airport provided the officers with a reasonable suspicion to believe that Moya's shoulder bag contained contraband.

Given the lack of effective alternatives available to the officers under the circumstances (allowing Moya to leave with the travel bag or illegally searching it), and the strong likelihood that Moya, now fully alerted, would take immediate steps to dispose of any contraband located in the shoulder bag, the officers' action in detaining the bag for investigation and subsequently obtaining a search warrant was reasonable. *See United States v. West,* 651 F.2d 71, 74 (1st Cir.1981), *petition for cert. filed,* 50 U.S.L.W. 3132 (U.S. Aug. 14, 1981) (No. 81–307). "We feel that the [officers] proceeded in the best way possible to protect both [Moya's] right to privacy and the government's access to potentially valuable evidence." *United States v. Benjamin,* 637 F.2d 1297, 1302 (7th Cir.1981).

In accordance with the foregoing reasons, the judgment of the district court is Affirmed.

SWYGERT, Senior Circuit Judge, dissenting.

I respectfully dissent. This appeal raises questions far more complex than those addressed by the majority and forces us to consider issues left unresolved by *United States v. Black,* 675 F.2d 129 (7th Cir.), petition for certiorari filed, 51 U.S.L.W. 3026 (U.S. June 3, 1982). The *Black* court

did not decide if a seizure of Black occurred because it found that objective justification sufficient to create reasonable suspicion existed. 675 F.2d at 136, 137. There was, moreover, no question that Black consented to the police-citizen encounter during the period in which the police garnered the objective justification. 675 F.2d at 131–32. Because the agents here did not have a basis for an articulable suspicion and because there is substantial evidence that Moya did not consent to the encounter, the seizure issue cannot be avoided here.

The degree of intrusiveness of stops that do not rise to the level of arrests may vary, and in order to be lawful in a given case it must be proportional to the degree of suspicion that prompted the intrusion. When little or no suspicion exists, therefore, very little intrusion is tolerable. *Brown v. Texas,* 443 U.S. 47, 52, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357 (1979), strongly states this principle of proportionality:

> In the absence of any basis for suspecting appellant of misconduct, the balance between the public interest and appellant's right to personal security and privacy tilts in favor of freedom from police interference.... [E]ven assuming that [a strong social] purpose is served to some degree by stopping and demanding identification from an individual without any specific basis for believing he is involved in criminal activity, the guarantees of the Fourth Amendment do not allow it. When such a stop is not based on objective criteria, the risk of arbitrary and abusive police practices exceeds tolerable limits.

*See also Delaware v. Prouse,* 440 U.S. 648, 649, 654, 99 S.Ct. 1391, 1393, 1396, 59 L.Ed.2d 660 (1979) ("the permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests"); *United States v. Bautista,* 684 F.2d 1286, 1290 (9th Cir.1982) (prolonged questions must be "related in scope to the justification for their initiation," quoting *United States v. Brignoni-Ponce,* 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975), quoting *Terry v. Ohio,* 392 U.S. 1, 29, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968)); *United States v. Ramirez-Cifuentes,* 682 F.2d 337, 343 (2d Cir. 1982) (court must "carefully measure[ ] the need for the stop against the nature of the intrusion suffered"); *United States v. Nembhard,* 676 F.2d 193, 202 (6th Cir.1982) (reasonableness of a stop is dependent on balance of public interest and private right to be free from arbitrary interference); *United States v. Streifel,* 665 F.2d 414, 422 (2d Cir.1981) ("[A]n officer having a reasonable suspicion, based on articulable, objective facts, that criminal activity is afoot may make an investigatory stop that is reasonable both in its duration and its intrusiveness .... In balancing the government's law enforcement interests, it is generally true that the more intrusive the stop, the stronger the justification must be ... and that 'if probable cause is lacking, the intrusion must be no greater than the circumstances require,'" quoting *United States v. Vasquez,* 638 F.2d 507, 520 (2d Cir.1980), *cert. denied,* 450 U.S. 970, 101 S.Ct. 1490, 67 L.Ed.2d 620 (1981), 454 U.S. 847, 102 S.Ct. 165, 70 L.Ed.2d 135 (1981)); *United States v. Viegas,* 639 F.2d at 45 ("The facts before the agents ... adequately justified the initial inquiry.... The slight intrusion of this encounter was supported by the [defendants'] evasive actions in the airport...."); *United States v. Dodier,* 630 F.2d 232, 234–35 (4th Cir.1980) ("The minimal intrusion on privacy rights by an investigative stop is permissible if 'the police officer [can] point to specific and articulable facts which ... reasonably warrant that intrusion,'" quoting *Terry v. Ohio,* 392 U.S. at 21, 88 S.Ct. at 1879).

Whether an investigatory stop of limited intrusiveness is controlled by the fourth amendment therefore depends on the justification for even that limited intrusion. This rule is rooted in the Court's interpretation of the fourth amendment as embodying the dual concerns of protecting privacy interests and avoiding arbitrary official action. *See Michigan v. Summers,* 452 U.S. 692, 701 & n. 14, 101 S.Ct. 2587, 2593 & n.

14, 69 L.Ed.2d 340 (1981); *Reid v. Georgia,* 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890; *Brown v. Texas,* 443 U.S. at 51, 99 S.Ct. at 2640 (fourth amendment "assure[s] that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field"); *Delaware v. Prouse,* 440 U.S. at 654, 661, 662–63, 99 S.Ct. at 1396, 1400, 1400–1401; *United States v. Brignoni-Ponce,* 422 U.S. at 882, 95 S.Ct. at 2580; *Terry v. Ohio,* 392 U.S. at 14 & n. 11, 15, 21–22, 88 S.Ct. at 1876, 1879–80 & n. 11. If the threshold fourth amendment inquiry were limited to consideration of the physical circumstances of the stop, apart from the justification for the officers' approach, the officers' discretion to make arbitrary or discriminatory stops would be unfettered. *See* A Model Code of Pre-Arraignment Procedure § 110.2(1)(a) & Commentary 262–63, 269–70, 273, 276–77 (1975).

It is important to remember that *Terry* stops are valid only because of an exception to the usual rule requiring "advance judicial approval of searches and seizures through the warrant procedure." *Id.* at 20, 88 S.Ct. at 1879. The exceptions to this general rule are motivated by necessity but are limited by the requirement that judicial approval be available after the fact if it is impossible in advance:

> The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances.

*Id.* at 21, 88 S.Ct. at 1879 (footnote omitted). Because reviewability is central to the scheme of this exception to the warrant requirement, declining to examine the justification for police conduct would be to abdicate a responsibility and to invite arbitrariness.

It is true that the Supreme Court has noted that "not all personal intercourse between policemen and citizens involves 'seizures' of persons." *Reid v. Georgia,* 448 U.S. at 440 n. *, 100 S.Ct. at 253 n. *; *Terry v. Ohio,* 392 U.S. at 19 n. 16, 88 S.Ct. at 1879 n. 16. Asking a passerby for directions, *see United States v. Viegas,* 639 F.2d at 44, or questioning possible witnesses of a crime, *see* A Model Code of Pre-Arraignment Procedure § 110.2(1)(b) (1975), for example, may invoke no fourth amendment concerns. The reason for these exceptions, however, is not that "the law does not concern itself with trifles"; it is because these situations, unlike inherently confrontational ones, do not pose any risk of arbitrary or abusive exercise of discretion. But whenever an officer identifies himself as a drug enforcement agent and singles out an individual for questioning, the implication of suspicion and the potential for abuse are clear.

This is not to say that all intrusions, no matter how minimal, in which the risk of arbitrariness is present must be justified by a uniform degree of suspicion. Such a rule was rejected in *Terry v. Ohio,* 392 U.S. at 16–19, 88 S.Ct. at 1877–1878. Rather, the test is "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *Id.* at 19, 88 S.Ct. at 1878. Less suspicion is required to initiate a minor intrusion, therefore, than to justify a more severe restriction on liberty.

In assessing reasonableness the court must weigh the importance of the governmental and individual interests. *See Michigan v. Summers,* 452 U.S. at 702, 101 S.Ct. at 2594. It is not enough to say that, in a case like the present one, the limited nature of the intrusion makes the individual interest inconsequential when compared with the government's overwhelming interest in controlling drug trafficking. If the government's general interest were at issue, it would outweigh almost any individual interest and stretch fourth amendment protections wafer thin. That kind of balancing, however, is improper because the court's duty is to "evaluate the reasonableness of a *particular* . . . seizure in light of the *particular* circumstances." *Terry v.*

*Ohio,* 392 U.S. at 21, 88 S.Ct. at 1879 (emphasis added). *See* A Model Code of Pre-Arraignment Procedure, Commentary 276–77 (1975). When an officer cannot articulate suspicions concerning a particular individual, the government's interest in controlling drug trafficking by that individual is small. *Brown v. Texas,* 443 U.S. at 52, 99 S.Ct. at 2641. In fact, the government then has an interest in avoiding arbitrariness.

The district court, relying upon *Reid, supra,* held that at the time the police officers approached Moya on the cab line, the officers did not have a basis for an articulable suspicion that Moya was involved in criminal activity. At 341, 345.

The district court found "that Moya showed no hesitancy in agreeing to respond to [the agents'] questions or in agreeing to remove himself from the taxi line and enter the terminal foyer." At 341–342, 344–345. This finding is inconsistent with the testimony of the agents, and is clearly erroneous. The agents testified that although Moya agreed to the agents' initial request to speak with him, he refused to give them any identification and denied that he had any. At 344–345. This version of the facts was accepted by the district court; it was critical to the district court's determination that a basis for articulable suspicion had arisen:

> The subsequent interview, however, was ample to justify detention of the luggage. The first question addressed to Moya at the time he was standing in the cab line was a request for identification. Moya's contention that he had none was, of course, suspicious in itself.

At 345.

This cab line exchange raises a critical question. When a person refuses to comply with a police request for identification, does this form a basis for articulable suspicion? In *Brown v. Texas, supra,* the fact that a citizen angrily "refused to identify himself and angrily asserted that the officers had no right to stop him," 443 U.S. at 49, 99 S.Ct. at 2639, did not give the officers a right to further detain him. *Id.* at 50, 99 S.Ct. at 2640. The police officers observed Brown in a high drug area, "looking suspicious," walking away from another person. These observations, in addition to Brown's refusal to identify himself, however, were insufficient to justify further detention of Brown. *Id.* at 52, 99 S.Ct. at 2641.

On the basis of *Brown,* then, if Moya, instead of denying he had identification, had refused to give the agents any identification, the agents would have had no basis for an articulable suspicion that Moya was involved in criminal conduct. The result, therefore, of the majority's holding is that a citizen must assert his fourth amendment right in only one manner—or lose it. Such a strict rule favoring police over citizens is contrary to the spirit of the fourth amendment, to the balancing of private and public interests, and to our abhorrence at arbitrary police conduct.

It is clear that Moya was "seized" at some point during the encounter. After refusing to give the officers any identification, Moya agreed to step inside the terminal. This acquiescence does not amount to consent. A reasonable person faced with continued police questioning would not feel free to walk away. *See Terry v. Ohio,* 392 U.S. at 18, 88 S.Ct. at 1878 ("a search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope"); *id.* at 28–29, 88 S.Ct. at 1883–1884 ("The Fourth Amendment proceeds as much by limitations upon the scope of government action as by imposing preconditions upon its initiation."); *United States v. Gooding,* 695 F.2d 78, 82 (4th Cir.1982) (prolongation of questioning when preliminary questions fail to raise any suspicion contributes to finding that defendant was detained); *United States v. Bautista,* 684 F.2d 1286, 1290 (9th Cir.1982) (prolonged questioning must be justified); *United States v. Berry,* 670 F.2d 583, 597 (5th Cir.1982) (*en banc*) ("Statements which intimate that an investigation has focused on a specific individual easily could induce a reasonable person to believe that failure to cooperate would lead only to formal detention.") (footnote omitted). *See also United States v. Jodoin,* 672 F.2d 232, 235 (1st Cir.1982) (when answers to initial questions produce additional suspicion they justify further questioning).

Even if Moya consented to step inside the terminal, the tone of the police-citizen encounter abruptly changed thereafter. After producing his plane ticket, Moya asked what the stop was all about. At 339. The agents ignored the question and continued to press Moya for additional identification. *Id.* Surely the aura of coercion must be found here when the officers refused to answer Moya's question. Their refusal cannot be construed as creating a friendly, relaxed, and everyday tone to the police-citizen encounter, and it is clear error to conclude otherwise.

Unlike the defendant in *Black,* Moya's identification provided no additional basis for suspicion. Black was travelling under an alias on a one-way first class ticket. 675 F.2d at 137. Black told the officers he had been picking coconuts to earn money. *Id.* Black's story was implausible. *Id.* Moya's identification, in contrast, was completely in order. At 339.

The only remaining fact, the denial of the plastic bag glimpsed as Moya produced his identification is a far cry from the narcotics placed in plain view in *Black.* 675 F.2d at 138. That denial is entitled to even less weight as a basis for an articulable suspicion than the earlier denial of identification. Obviously Moya did not want to produce the plastic bag. The district court held, in accordance with *Brown,* that Moya had a valid fourth amendment right to refuse to produce the plastic bag. At 346. Indeed, the district court found that Moya's fourth amendment rights were violated when the police officers seized the plastic bag. *Id.* at 346. It defies logic to conclude on the one hand that the police officers could not seize the plastic bag, but that on the other the agents could seize the shoulder bag which contained the plastic bag. I cannot endorse this illogical result or the majority's further erosion of the fourth amendment's guarantees.