**UNITED STATES of America, Plaintiff,**

v.

**Thomas GARVIN, Defendant.**

**No. 83 CR 381.**

United States District Court,
N.D. Illinois, E.D.

Dec. 12, 1983.

*Culinary & Bartenders Pension Trust,* 662 F.2d 617 (9th Cir.1981).

record by a stipulation as to what Garvin's aunt Sharon Orr would have testified. As is so frequently the case in airport stop cases, the testimony was in sharp dispute. This opinion will begin with the broad outline of uncontroverted facts, then identify and resolve the material areas of factual dispute.

At about 9:10 p.m. May 4, 1983 Turney and Burzinski were seated at United Air Lines' Gate F-9 at O'Hare, engaged in surveillance of an incoming flight from Ft. Lauderdale, Florida. As they watched the passengers deplaning, they saw Garvin and, a few moments later, Dennis Brand ("Brand") come into the waiting area. After Garvin and Brand talked for a few minutes, they split up and started to walk toward the O'Hare terminal concourse to catch their different flights. Burzinski then approached Brand, and almost immediately thereafter Turney approached Garvin. After the discussion and events around which the principal controversy centers, Turney obtained from Garvin the cocaine and the statements that are the subject matter of the current motion. It is in the interstices between those acknowledged facts that the critical disputes that govern here must be decided.

First the respective accounts of the initial Garvin-Brand conversation, as observed by the officers, are divergent. Turney has Garvin waving to the later-emerging Brand (Tr. 10), while Garvin says he did not wave but merely stopped and waited for Brand so he could give Brand Mrs. Orr's phone number in Des Moines (Tr. 93–94, 96). Turney and Burzinski had Garvin and Brand sitting down, talking in hushed tones for about five minutes and looking at a piece of paper (Tr. 12, 144–45), while Garvin says they spoke standing for about two minutes (Tr. 97–98) and that he showed and then gave Brand a paper with Mrs. Orr's phone number, where Garvin could be called in Des Moines (Tr. 97). When Garvin and Brand split up to go to their respective connecting flights (Garvin to Des Moines and Brand to Omaha), there is no dispute but that Burzinski intercepted Brand and

Dan K. Webb, U.S. Atty., Jeffrey E. Rogers, Asst. U.S. Atty., Chicago, Ill., for plaintiff.

Stephen J. Knorr, Federal Defender Program, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

On June 2, 1983 Thomas Garvin ("Garvin") was indicted on a charge of violating 21 U.S.C. § 841(a)(1) by the knowing and intentional possession, with intent to distribute, of approximately 200.07 grams of a substance containing cocaine, a Schedule II controlled substance. Garvin has moved to suppress all evidence and statements at the time of his arrest, claiming that the seizure of his person and then of the cocaine had violated Garvin's Fourth Amendment rights. On July 7, 1983 this Court held an evidentiary hearing (the "hearing") on Garvin's motion. For the reasons stated in this memorandum opinion and order, Garvin's motion is granted in its entirety.

### Findings of Fact ("Findings")

Chicago Police Department Officers James Turney ("Turney") and Rosemary Burzinski ("Burzinski"), both assigned to the O'Hare International Airport ("O'Hare") Drug Task Force, and Garvin were the only witnesses at the hearing, though the parties then supplemented the

Turney did the same to Garvin. Turney said he showed Garvin his star, identified himself as a police officer and asked if he could ask a few questions, to which Garvin replied "Sure" (Tr. 14); Garvin said he was already past the others in the direction of the terminal (Tr. 100–01), turned around when he heard voices and saw the lady with the badge talking with Brand (Tr. 101–02) and was called back by Turney (Tr. 103), who he simply assumed was a policeman because of Burzinski's badge (Garvin said Turney did not identify himself or display his own badge) (Tr. 103–04).

To that point the disparities are non-material, because even on Turney's version there was nothing in the events to establish a reasonable suspicion Garvin had committed or was then committing a crime.[1] But the nature of Garvin's initial answers to Turney poses the first difference relevant in legal terms. According to Turney he asked for identification and Garvin said he had lost his wallet (Tr. 14); Turney asked his name and Garvin answered "Thomas Garvin" or "Tom Garvin" (id.); Turney asked for and was given Garvin's plane ticket, which was in the name "R. Strapp" (Tr. 14–15; G.Ex. 3); and finally Turney asked Garvin why the name other than his own was on the ticket and Garvin said he often used different names while flying (Tr. 15). Garvin on the other hand testified he responded to Turney's inquiry for identi-

fication by saying he had lost his driver's license for drunk driving (Tr. 105) (this was untrue, for Garvin was really not carrying identification because he was traveling as "Ronnie Strapp"[2] (id.)); he answered Turney's inquiry by giving the name "Ronnie Strapp" (id.) and saying he had a ticket with his name on it (Tr. 106); and Turney then took the ticket to look at it and never returned it to Garvin (id.).

This Court credits Garvin and not Turney. It is not credible that, stopped for what Turney himself described as simply asking a "few questions," and lacking any identification save the "R. Strapp" airline ticket,[3] Garvin would give his real name and give cause for *immediate* suspicion when the discrepancy was bound to be revealed by the officer's natural next request to see the ticket. It is far more likely Garvin would initially have stayed with the only cover story he had available to him at that time: that he was indeed Ronnie Strapp.

And there is more to confirm the Garvin version. Unquestionably Garvin called his aunt in Des Moines within the first few minutes after Turney stopped him (Tr. 17–18, 109–12). According to Turney that occurred when Turney had said he was conducting a narcotics investigation of flights from Ft. Lauderdale and had reason to believe Garvin might be carrying narcotics,

1. Like all the judges in this District Court, in different cases this Court has heard testimony from the O'Hare narcotics detail in which the deplaning passenger who is first off the plane coming in from Florida is suspect because in a hurry, the deplaning passenger who is among the last to emerge from the runway is suspect because obviously delaying, and the deplaning passenger who is in the middle of the emerging group is suspect because trying to lose himself or herself in the crowd. Much the same is true as to various other aspects of the observed conduct of incoming passengers, such as the different paces at which they go from the arrival gate toward the terminal, the extent to which they look around while walking ("furtively" is the usual adverb attached to what, in a totally innocent and inexperienced plane traveler, might be looking around in simple wonderment at the masses of people encountered at O'Hare on a typical day) and the different things they do in the baggage area downstairs (where even the

experienced traveler often has difficulty determining at which conveyor the baggage will be unloaded) and once at the baggage conveyor itself. Because the "drug courier profile" thus tends to become very blurred, as though the characteristics are shaped to fit the conduct instead of the other way around, the controlling decisions wisely require a showing of "specific and articulable facts" before the stopping officers are found to have demonstrated the basis for even a temporary stop of the passenger.

2. This was the name given Garvin by the source in Florida from whom he had obtained the narcotics and the plane ticket (Tr. 96).

3. Garvin also testified he had written "Ronnie Strapp, Des Moines, Iowa" on the identification card in the plastic case on the outside of his garment bag he had carried off the plane (Tr. 95).

asking if Garvin would consent to a search of his bags (Tr. 16); Garvin then asked if he could make a call (*id.*).[4] Garvin's explanation was that after Turney had said Garvin "matched the description of a gentleman that had did [sic] a drug transaction in Fort Lauderdale airport" (Tr. 107) and wanted to search Garvin's luggage (Tr. 108), Garvin had asked Turney if he could make a phone call to verify his identity and Turney agreed (Tr. 108–09).

But what is far more significant than the differing versions of what triggered the telephone call was the *nature* of the call when made. It was stipulated that when Garvin placed a collect call to Mrs. Orr—the aunt who had raised Garvin since the time his mother died when Garvin was 10 years old (Tr. 112)—he gave a name *other than Tom Garvin* (a name Mrs. Orr did not recognize and does not recall) (Stip. ¶ 3). As the stipulation went on:

4. She then heard a voice she recognized as her nephew, Tom Garvin, say "Aunt Sharon, Aunt Sharon." Upon hearing Tom's voice, she accepted the call.

5. She recalls Tom Garvin saying that he was in Chicago and the police wanted to search him. He also said that he was scared and did not know what to do, whether he should let them search him. He then asked her to talk to the officer.

6. She asked the officer several times what the problem was and he kept replying "no problem, ma'am, no problem, ma'am." The officer then hung up the phone.

If as Turney claimed Garvin had given him his real name and was calling Mrs. Orr only about the question of consent to the search, it would have been bizarre in the extreme for Garvin to have placed the collect call using *another* name. It is obvious Garvin's version is more credible: When he called he identified himself to the operator as "Ronnie Strapp," and as soon as his aunt came to the phone he said "Hi Aunt Sharon" so she would recognize the caller.

Indeed she recognized Garvin's voice right away and accepted the call (Stip. ¶ 4).

Accordingly this Court finds Garvin *did* initially give Turney the name "Ronnie Strapp"—a name consistent with the plane ticket. Turney thus still had no "specific and articulable facts" that reasonably gave rise to any suspicion Garvin had committed or was committing a crime. This Court also credits Garvin's testimony and finds Turney took and never returned Garvin's plane ticket (though Turney testified he was "pretty sure" he had returned it and then retrieved it from Garvin later that night, he said there was a "slight chance" he might have kept it (Tr. 56–57)). Finally in that respect, it should be noted Garvin's connecting flight to Des Moines was due to depart between 15 minutes (Tr. 92) and 40 minutes (Tr. 56) after the Ft. Lauderdale flight came in. With Garvin's ticket in the hands of a police officer, his belief he was not free to go had to be enhanced by the very fact that the time spent in the encounter, the questioning, the call to his aunt and the further questioning that followed made the possibility of his catching the flight remote at best.

Taking all the factors into account, this Court finds Garvin, like any reasonable person in view of all the circumstances surrounding the incident, believed he was not free to leave:

1. Turney's conduct was unquestionably a show of authority that restrained Garvin's freedom of movement: the stop by a police officer (whether self-identified, as Turney testified, or simply assumed from Burzinski's badge and the contemporaneous Turney stop, as Garvin testified); the accusatory statements (whether the actual statement "I had reason to believe that he might be carrying narcotics," as Turney testified, or "He told me I matched the description of a gentleman that had did [sic] a drug transaction in Ft. Lauderdale airport," as Garvin testified); the taking and retention of Garvin's airplane ticket; and the

---

**4.** It is worth noting that on Turney's own version Garvin asked *permission* to call (Tr. 16), a request consistent with a belief on Garvin's part he was not free to go or to do as he wished.

delay of Garvin for a period that made it questionable whether he could make the Des Moines flight, whether or not Turney ultimately chose to return his ticket.

2. Though not a controlling factor, Garvin's own characteristics tended to make him more vulnerable to the situation. Garvin is 23 years old, born in Iowa and raised on a South Dakota farm and with no more than a ninth grade education (having had straight Fs from the sixth grade on) (Tr. 90–91). Garvin is on probation from a prior conviction on a narcotics offense. This Court rejects the quantum leap from that involvement to any notions of sophistication on Garvin's part in the arcane mysteries of the Fourth Amendment, either generally or in terms of airport stops (a subject on which the Supreme Court itself continues to generate sharply split opinions). Again the law's "reasonable person" would have believed he was not free to leave under all the circumstances, and Garvin certainly was reasonable in so believing. As already stated, Garvin's asking *permission* of Turney to make a phone call to his aunt is corroborative of that belief.

3. At O'Hare, with no one remaining in the waiting area where Turney and Burzinski had stopped Garvin and Brand, and with Turney in possession of Garvin's airline ticket, the physical surroundings and circumstances were also conducive to Garvin's reasonable belief he was not free to leave and had to comply with Turney's requests.

Indeed Turney himself confirmed that from the very beginning he did not tell Garvin he was free to leave or he didn't have to answer any questions he didn't want to (Tr. 54–55).

Finally this Court credits Garvin's testimony on the question of consent. According to Garvin, Turney said he wanted to search Garvin's bags because he matched the description of the man who had made a Florida drug transaction, and if Garvin did not consent Turney would get a search

warrant. As already reflected, Turney's version differed. But whatever recollection is accurate, Garvin's statement he did not consent at any time (knowing the drugs were in the bag) (Tr. 109, 115) is credible and persuasive.

■ This Court therefore concludes Garvin was in fact seized when Turney stopped him and took and retained his airline ticket. At that time the only objective facts Turney knew about Garvin were that (1) he had arrived from a so-called "source city," (2) after coming out of the plane's runway he had spent a few moments waiting for a fellow passenger (someone he apparently knew under either version of the testimony) to emerge, then talked briefly and quietly with the fellow passenger (including both looking at and discussing a piece of paper), (3) then he separated from the fellow passenger and was on his way to the terminal and (4) when stopped he produced a plane ticket issued in the same name he gave Turney as his own (having stated to Turney he had no driver's license because he had lost it on a drunk driving charge)—a plane ticket that called for an early departure, which provided an entirely appropriate reason for his proceeding toward the terminal.

Turney testified Garvin was placed under arrest (the formal declaration of arrest, not what this Court has found a seizure in fact) at 9:40 p.m., 30 minutes after Garvin had deplaned (Tr. 80). That period of detention was itself unreasonable, given this Court's findings of the absence of reasonable grounds for suspicion. Turney lacked any probable cause to arrest Garvin until much after the initial seizure, when Garvin made a movement that exposed a white powder that ultimately proved to be cocaine. Indeed Turney himself corroborates that finding, because he testified he told Garvin he was under arrest only at that much later time, after Garvin's garment bag fell to the floor and Turney said he saw the plastic bag with white powder in an open outer pocket of the garment bag (Tr. 74).[5]

5. From the physical configuration of the gar-      ment bag, it is difficult to credit Turney's testi-

Turney therefore both seized Garvin at the early time already identified and kept Garvin there for an extended period under circumstances that constituted an arrest lacking probable cause. Both the finding of the two bags of cocaine and Garvin's subsequent incriminating statements took place long *after* that seizure and arrest, and they took place without Garvin's having initially consented to a search of the garment bag or his person.

### Conclusions of Law ("Conclusions")

■ There is no quarrel between the government and Garvin's counsel as to the relevant test for determining the seizure of a person in Fourth Amendment terms: whether "in view of all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (opinion of Stewart, J., announcing the judgment of the Court). Since *Mendenhall* our own Court of Appeals in *United States v. Black,* 675 F.2d 129, 133–34 (7th Cir.1982), and now it appears the Supreme Court's majority itself in *Florida v. Royer,* —— U.S. ——, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), have confirmed the appropriateness of that standard to resolve the seizure question.

Indeed *Royer* reconfirms the relevant teachings in this area of the law (where appropriate, the following quotations have been adapted to conform to the present case):

1. *Royer,* 103 S.Ct. at 1324:

[I]t is unquestioned that without a warrant to search [Garvin's] luggage and in the absence of probable cause and exigent circumstances, the validity of the search depended on [Garvin's] purported consent. Neither is it disputed that where the validity of a search rests on consent, the [government] has the burden of proving that the necessary consent was obtained

and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority.

2. Any *Terry* investigatory stop (*Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)) is a limited exception to the Fourth Amendment requirement of probable cause for any seizure of a person (*Royer,* 103 S.Ct. at 1324):

*Terry* created a limited exception to this general rule: certain seizures are justifiable under the Fourth Amendment if there is articulable suspicion that a person has committed or is about to commit a crime.

3. *Royer,* 103 S.Ct. at 1325–26:

The predicate permitting seizures on suspicion short of probable cause is that law enforcement interests warrant a limited intrusion on the personal security of the suspect. The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case. This much, however, is clear: an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.... It is the [government's] burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.

4. *Royer,* 103 S.Ct. at 1326:

[S]tatements given during a period of illegal detention are inadmissible even though voluntarily given if they are the *product of the illegal detention and not the result of an independent act of free will.*

5. *Royer, id.:*

---

mony that the small bag of cocaine in the deep outer pocket of the garment bag would in fact have become visible from the garment bag's

having fallen to the floor. Under this Court's findings, however, it need not be decided whether that testimony should be accepted or rejected.

[I]f the events in this case amounted to no more than a permissible police encounter in a public place or a justifiable *Terry*-type detention, [Garvin's] consent, if voluntary, would have been effective to legalize the search of his [garment bag and person]. [This Court], however, concluded not only that [Garvin] had been seized when he gave his consent to search his luggage but also that the bounds of an investigative stop had been exceeded. In [this Court's] view the "confinement" in this case went beyond the limited restraint of a *Terry* investigative stop and [Garvin's ultimate] consent [if any] was thus tainted by the illegality, a conclusion that require[s] reversal in the absence of probable cause to arrest.

As Justice Powell's concurrence in *Royer* put it (*id.* at 1330, again adapted):

Neither the evidence in this case nor common sense suggests that [Garvin] was free to walk away.

*Royer* then concluded with an analysis and holding that might well have been written for this case. Indeed the granting of Garvin's motion follows a fortiori from the *Royer* situation. Nothing in the Supreme Court's later "canine sniff" decision in *United States v. Place*, — U.S. —, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) compels a different conclusion. Finally this Court's analysis and conclusion are wholly consistent with our Court of Appeals' post-*Black* opinions in *United States v. Moya*, 704 F.2d 337 (7th Cir.1983), in which certiorari was just granted and the judgment was vacated for reconsideration in light of *Place*, — U.S. —, 104 S.Ct. 418, 78 L.Ed.2d 355 (1983); *United States v. $73,-277*, 710 F.2d 283 (7th Cir.1983); and *United States v. $84,000*, 717 F.2d 1090, 1094–96 (7th Cir.1983). *Accord*, such cases as *United States v. Waksal*, 709 F.2d 653 (11th Cir.1983); *cf. United States v. Thompson*, 712 F.2d 1356 (11th Cir.1983).

Accordingly Garvin's motion to suppress the evidence (the cocaine identified in the indictment) and his statements given the evening of May 4, 1983 are granted. Because the suppressed matters appear to be essential to prosecution, counsel are directed to appear at a status call at 9 a.m. December 16, 1983 to discuss any anticipated further proceedings (Garvin's presence at that status call is waived).